IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| LOIS CHAUNCEY, | ) | C/A 2:12-968-DCN-BM |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -versus- | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| LIFE CYCLE ENGINEERING, INC.; ROBERT | ) | |
| F. FEI, II; JAMES R. FEI; GREG WALLS; AND | ) | |
| MICHAEL E. SCHWARTZ, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

This action has been filed by the Plaintiff, a former employee of the Defendant Life

Cycle Engineering, Inc. ("Life Cycle"), asserting numerous claims against the Defendants arising out

of her employment at Life Cycle. The Defendants filed a motion for summary judgment pursuant to

Rule 56, Fed.R.Civ.P., on January 11, 2013, and Plaintiff also filed a motion for partial summary

judgment as to her FMLA interference claim[1] on the same day. Plaintiff and Defendants filed their

respective memoranda in opposition to each others' motions on January 28, 2013, following which

both Plaintiff and the Defendants filed reply memoranda on February 7, 2013.

These motions are now before the Court for disposition.[2]

---

[1]Plaintiff also has a retaliation claim under the FMLA, which is not part of her partial motion
for summary judgment.

[2]This case was automatically referred to the undersigned United States Magistrate Judge for
(continued...)



1

**Background and Evidence**[3]

Plaintiff initially interviewed with the Defendant Greg Walls, Life Cycle's Vice President for Human Resources, in May 2008 for a position at Life Cycle as an Organizational Development Specialist in the Human Resources Department. Plaintiff's Deposition, pp. 63-64. During the interview, Walls shared that he was not planning to stay long at Life Cycle and was looking for someone to eventually take over his position when he left, which Plaintiff got the impression would be in a year or two. Plaintiff's Deposition, pp. 63-64, 73, 88. Walls told Plaintiff that, while he did not have the final say on who would replace him when he retired, he did have a lot of influence. Plaintiff's Deposition, pp. 77, 91. Shortly thereafter, Plaintiff was brought in for a panel interview with Walls; the Defendant Bob Fei, President; Sonya Brookshire; Mark Petersen-Overton; and Marty Baker. Plaintiff's Deposition, p. 69. Plaintiff was thereafter hired for the position of Senior Organizational Specialist with an annual salary of $90,000. Plaintiff's Deposition, pp. 62, 69 & Exhibit 1.

Plaintiff testified that, based on her twenty odd years in human resources, she understood the employment at will doctrine and believed that, based on state and federal legal requirements, she was an at-will employee when she was hired. Plaintiff's Deposition, p. 82. In October 2008, Plaintiff received a salary increase from $90,000 to $93,000. Plaintiff's Deposition,

---

[2](...continued)
all pretrial proceedings pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(g), D.S.C. The parties have filed motions for summary judgment. As these are dispositive motions, this Report and Recommendation is entered for review by the Court.

[3]The facts and evidence are considered and discussed hereinabove in the light most favorable to the party opposing summary judgment, respectively. Pittman v. Nelms, 87 F.3d 116, 118 (4th Cir. 1996).

p. 60 & Exhibit 4. Walls also disclosed to Plaintiff in the fall of 2008 that he had discussed his plan of retiring and promoting her to his position with Bob Fei and the Defendant Jim Fei, Life Cycle's Chief Executive Officer, and that they were on board with the plan. Plaintiff's Deposition, p. 91. Walls told Plaintiff that he intended to notify the Executive Leadership Team ("ELT") of his plans in December 2008, with a subsequent general announcement in January 2009. Plaintiff's Deposition, p. 91.

In December 2008, Life Cycle had to lay off a number of individuals because of poor business management. Plaintiff's Deposition, p. 93. That same month, Plaintiff received a call from one of her contacts at another company offering her a human resources job with a compensation package in the range of $125,000. Plaintiff's Deposition, p. 95. Plaintiff disclosed this information to Walls, who communicated the situation to Bob and Jim Fei. Plaintiff's Deposition, pp. 96-97. Thereafter, in January 2009 Plaintiff was given a raise to approximately $120,000 per year and her job title was changed to Organizational Development Manager. Plaintiff's Deposition, p. 98.

When no announcement was made about Walls' retirement, Plaintiff approached Walls in February or March 2009 about when he planned to make the announcement. Plaintiff's Deposition, p. 93. Walls told Plaintiff that, due to the economy, he did not think he could afford to retire. Plaintiff's Deposition, pp. 93-94; 102. Walls also expressed his concern about announcing a change until they had resolved the turmoil caused by the layoffs in December. Plaintiff's Deposition, p. 94. In May 2009, Walls confirmed to Plaintiff that he was not going to retire and that he was staying with Life Cycle. At that point, Plaintiff knew that she was not replacing him. Plaintiff's Deposition, p. 102.

On July 7, 2009, Randy Heisler asked Plaintiff to contact two individuals about the



3

status of a pending project. Plaintiff responded (copying Walls) that she was at the hospital assisting her daughter-in-law, who was in labor. Plaintiff's Deposition, pp. 160-161. Walls responded to the Plaintiff that he did not realize this individual was Plaintiff's daughter-in-law. Plaintiff's Deposition, p. 164. In fact, the individual in question was not Plaintiff's daughter-in-law. Rather, Plaintiff testified that she "hosted" Citadel cadets, that this individual was the wife of one of the cadets, and that she considered this particular Cadet her "son". Plaintiff's Deposition, pp. 159, 163, 165. Walls testified that he was concerned that Plaintiff had been "less than honest" about the situation, when there was no reason for her to be less than totally honest. Walls' 30(b)(6) Deposition[4], pp. 71-72.

In October 2009, Walls tried to have a discussion with Plaintiff concerning some negative feedback he had received on the company's performance review initiative and recruiting process, both areas of Plaintiff's responsibility. Plaintiff's Deposition, pp. 206, 208; Walls' 30(b)(6) Deposition, pp. 73-74; see also Plaintiff's Memorandum in Opposition, p. 27. The purpose of the Quality Assurance Review (QAR) process was to share feedback from internal Life Cycle customers about the performance of the Human Resources Department. Plaintiff's Deposition, pp. 205-206. Walls shared with Plaintiff that she was overloading managers with too much information about the various processes and that there had been complaints about some of the training she had done. Walls' 30(b)(6) Deposition, pp. 73-74. He also told her that she needed to have a better understanding of processes before the next ones were "rolled out". Walls' 30(b)(6) Deposition, pp. 73-74. Plaintiff responded by telling Walls that she was sick and then walked out of the meeting, stating that she was not feeling well and would like to talk about it later. Plaintiff's Deposition, pp. 206, 209, 212. Walls

---

[4]In addition to the submission of Walls' individual deposition excerpts, the parties have also submitted excerpts from his separate deposition as the Defendant Life Cycle's 30(b)(6) Representative.

testified that he felt Plaintiff was very defensive about the QAR feedback and was unwilling to accept constructive criticism about issues in her area of responsibility. Walls' 30(b)(6) Deposition, p. 74. Walls also felt there was friction in the Human Resources office, particularly between him and Plaintiff, and that everyone in the department needed to "work on it together." Plaintiff's Deposition, pp. 213, 217. Nonetheless, Plaintiff received a $10,000 bonus in October 2009 and a pay raise to $125,000 at the end of 2009. Plaintiff's Deposition, pp. 61, 226-227. Bob Fei and Peterson-Overton also provided positive references for Plaintiff's application for an advanced degree at Northeastern College in November 2009, and Walls encouraged her about the issue. Plaintiff's Deposition, p. 137.

        In December 2009, Plaintiff responded to an anonymous employee survey by commenting that she was working 80-90 hours per week, was concerned about the workload, that the workload was not evenly distributed, and that the amount of work hours was impacting her physical health. Plaintiff's Deposition, pp. 236-237. On January 8, 2010, Walls called Plaintiff in for a meeting with himself and the Defendant Michael Schwartz, Chief Financial Officer, where Walls told Plaintiff that it was clear to him that she had a problem working for him, offered to help her exit the company, and told her that he could probably assist her in getting a severance package if she would leave. Plaintiff's Deposition, p. 230. Plaintiff denied that she had a problem working for Walls, but told him that other people in the company felt that Walls did not know what he was doing, that he was an "idiot", and that others felt he added no value to the company. Plaintiff's Deposition, pp. 232-234.[5] Plaintiff told Walls that she defended him to these people, but she also accused him of

---

[5]Plaintiff also told one of her peers in Human Resources, Sonya Brookshire, that she felt Walls was not doing his job. Plaintiff's Deposition, p. 237. Plaintiff testified that Walls wasn't doing much work while "we were killing ourselves", that he had horrible relations with an area of the department which he wouldn't reach out to and didn't want to correct that department's issues or
(continued...)

retaliating against her for the comments she had made on the anonymous internal employee survey. Plaintiff's Deposition, pp. 233-234.

During that same January 8, 2010 meeting, Walls shared with Plaintiff his concerns regarding her defensiveness related to the QAR feedback, that he was concerned about a confrontation that had occurred between Plaintiff and Jennifer Ash, another employee, in November 2009, as well as about a performance management communication that went out in December 2009. Plaintiff's Deposition, pp. 246-247. Walls also expressed concerns to Plaintiff about her conduct at a January 5, 2010 meeting, when he asked her in front of the team to explain a chart that she was responsible for, and she had just sat there and didn't respond. Walls Deposition, p. 76. Walls testified that when he was addressing his concerns with the Plaintiff, she said that she felt he was criticizing her performance because of comments she had made regarding management's attitude toward women. Walls Deposition, p. 76. Walls testified that he thought Plaintiff was trying to deflect attention from her performance issues and did not take this as a complaint of discrimination. Walls Deposition, p. 77. For her part, Plaintiff conceded that it was clear to her that Walls, from his perspective, felt there were problems with her performance and with their working relationship. Plaintiff's Deposition, p. 247. Plaintiff also testified that she believed Walls was not happy because of some assumptions he was making about her, the survey responses, and the fact that she was pushing back on some "illegal" practices. Plaintiff's Deposition, p. 247. See also, Plaintiff's Exhibit 3 [Meeting Notes].

---

[5](...continued)
concerns, that he didn't know what he was doing, and didn't have the depth of knowledge in HR. Plaintiff's Deposition, pp. 237-238. With respect to her discussions with Brookshire, Plaintiff testified that sometimes she would bring up that Walls wasn't doing his job and sometimes Brookshire would bring it up. Plaintiff's Deposition, p. 237.



6

Plaintiff also met with Jim Fei later that same day (January 8, 2010) and informed him that Walls had told her that Life Cycle was a "traditional" company and that anyone could see that women were not treated equally within the Company by the way Jim Fei treated his wife. Plaintiff's Deposition, pp. 256-258, 263. Fei responded that the Company does not discriminate against women and that from his perspective, Plaintiff had a problem working with Walls and she was upset that she didn't get Walls' job when he elected not to retire. Plaintiff's Deposition, pp. 256-257, 260-261. Plaintiff testified that by the end of the meeting with Fei, her "understanding" was that there was a need for she, Walls, and Brookshire to try harder to work together to get through some of their differences. Plaintiff's Deposition, p. 263.

Thereafter, Plaintiff and Walls went to lunch to clear the air about some of the things that were bothering them. Plaintiff's Deposition, p. 264. Walls and Plaintiff developed a two-way plan known as the "Relationship Guiding Principles" and decided to have weekly one-on-one meetings. Plaintiff's Deposition, p. 266. However, Plaintiff testified that during these meetings she felt intimidated and patronized;[6] Plaintiff's Deposition, p. 266; and in her performance appraisal dated February 11, 2010, Plaintiff received a mark of "2", indicating "not meeting expectations", in the area of "Interpersonal Relationships." Plaintiff's Deposition, Exhibit 17 [000015].[7] On June 2, 2010, Plaintiff was issued a performance improvement template with several areas of concern outlined. Plaintiff's Deposition, Exhibit 18. Specifically, it was noted that performance was a problem and

---

[6]Plaintiff testified that she was intimidated when Walls would say things such as "we're going to respect other's experience and knowledge" and "we are going to listen without defensiveness", after which he would stare and then ask "are you okay with that . . . ." (R.pp. 266-267).

[7]Plaintiff testified that Walls also received a score of "2" in Interpersonal Relationships on his performance appraisal, although this appraisal is not part of the record. Plaintiff's Deposition, pp. 271-272.

that "[i]f [Plaintiff's] performance does not improve, will move to a written warning." Plaintiff's Deposition, Exhibit 18.

On August 9, 2010, Plaintiff submitted a request for intermittent FMLA leave for a "serious medical condition", which was approved on August 11, 2010. Plaintiff's Deposition, Exhibits 22 & 23; Plaintiff's Memorandum in Support of Motion for Partial Summary Judgment, Exhibit 1. On or about August 13, 2010, Walls shared with Plaintiff her mid-year performance appraisal. Plaintiff's Deposition, p. 286, Exhibit 20. Plaintiff recalls Walls telling her that he did not like how she was treating him. Plaintiff's Deposition, p. 287. He also rated her as "not meeting expectations" in the area of working with him and Brookshire. Plaintiff's Deposition, Exhibit 20. Walls also commented on Plaintiff's evaluation as follows:

> -Your relationship with members of the HR leadership team and the CSG leadership team generally does not meet expectations.
> -Your insistence that things go your way and refusal to accept feedback/responsiblity lead to conflict and a lack of trust with team members.
> -[W]e have talked about these problems (i.e. Managers Meeting, QAR Feedback)[but] you continue to display these behaviors (i.e. Sonya/Greg, Red Carpet training, initial Top Jobs communication, ESG leadership team Talent Banding performance, dismissal of Relationship Guiding Principles);
> -Members of the HR and CSG leadership teams avoid you because they don't want to face conflict.

Plaintiff's Deposition, Exhibit 20 [000022 & 000024].

In answering the question "Am I a team advocate?", Walls rated Plaintiff as "not meeting expectations", and noted:

> Your inability to relate well with others, especially me, and other members of the HR and CSG leadership teams has caused a lack of trust and ineffectiveness. The lack of trust leads to teammates questioning your intentions and guarded interactions.

Plaintiff's Deposition, Exhibit 20 [000025].



8

Walls noted in giving Plaintiff an overall rating of "not meeting expectations", as follows:

> [Y]our relationship and teamwork must improve with others, especially with me, and other members of the CSG Leadership Team. Your insistence that things go your way and your refusal to accept feedback and responsibility must improve . . . . These same significant performance deficiencies have been discussed with you on a number of occasions with little or no improvement. If you do not immediately meet these expectations, and make lasting improvement, you will leave us no other alternative but to terminate your employment . . . .

Plaintiff's Deposition, Exhibit 20 [000026].

On or about August 19, 2010, Plaintiff went out on full-time FMLA leave. See Answer, ¶ 30. On September 21, 2010, Walls responded to an email from Plaintiff stating that it would be "helpful if we can stay in communication on a weekly basis regarding your status. Hope you get to feeling better." Plaintiff's Memorandum in Support of Partial Summary Judgment, Exhibit 3; cf. Walls Deposition, pp. 47-48.

On October 1, 2010, Life Cycle's annual salary increases went into effect and Plaintiff did not receive an annual salary increase for the first time since her employment with the Defendant. Defendants' Answer, ¶¶ 33 - 34. Defendants contend that Plaintiff's salary was the highest among her peers in the Corporate Services Group and that she did not receive an increase because she was on notice that her performance was not acceptable. Defendants' Answer, ¶ 34. On October 6, 2010, Walls called Plaintiff at home while on FMLA leave and made a notation in his email/call log that he "had woke her up(pain killer)." Court Docket No. 22-5 (Walls Email/call log at 1).[8] This entry follows a notation from the previous day which states that Plaintiff's husband came by to pick up her

---

[8]Since Walls' email of September 21, 2010 to Plaintiff is not on this log, it does not appear to be a comprehensive list of all contact with Plaintiff during her leave. See Plaintiff's Memorandum in Support of Partial Summary Judgment, Exhibit 3; Court Docket No. 22-5 (Walls Email/call log at 1).



9

401(k) loan check and that some eye surgery for which she had been scheduled had been postponed, but she would call Walls. <u>Court Docket No. 22-5</u> (Walls Email/call log at 1).

Plaintiff returned from FMLA leave on November 8, 2010 with restrictions that she only work four (4) to six (6) hours until she could return to full-time duty on November 22, 2010. <u>Plaintiff's Deposition</u>, p. 307; <u>Court Docket No. 22-5</u>; <u>Defendant's Response No. 8 to Plaintiff's Request to Admit</u>. After Plaintiff returned from leave, two events occurred that Defendants contend indicated to Walls that Plaintiff could not or would not change her attitude or working relationships. <u>Plaintiff's Deposition</u>, Exhibit 30. As to the first event, after Walls reminded the invitees to a Recruiting Team Update about a meeting scheduled for Tuesday, November 9, at 3:30 p.m.[9], Plaintiff changed the meeting to Thursday, November 10, 2010 without getting Walls' approval. <u>Plaintiff's Deposition</u>, Exhibit 29. Plaintiff testified she had a doctor's appointment on the day the meeting was originally scheduled. <u>Plaintiff's Deposition</u>, pp. 310-312. Plaintiff testified that prior to her FMLA leave, it was her duty to schedule these type meetings and she had previously rescheduled such meetings for varying scheduling conflicts. <u>Plaintiff's Deposition</u>, p. 312. In her email to Walls rescheduling the meeting, Plaintiff acknowledged that the time she rescheduled it for had been "blocked out" by Walls for vacation, but she stated to Walls in her email: "I think you'll be here."[10]

---

[9]Prior to this time, while Plaintiff was on FMLA leave, Walls had sent out an email to other invitees that effective October 26, 2010 until December 31, 2010, the Recruiting Team Update meeting would take place every Tuesday, from 3:30 p.m. to 4:30 p.m. This information was included in the email forwarded to Plaintiff. <u>See</u> <u>Plaintiff's Deposition</u>, Exhibit 29.

[10]Although Plaintiff contends that Walls knew why she rescheduled her meeting, her initial email to him did not disclose any reason and simply stated that she had rescheduled it so she could attend and get up to speed. <u>Plaintiff's Deposition</u>, Exhibit 29. Plaintiff also argues in her brief that she did not know that Walls was supposed to be out on vacation on the re-scheduled date; <u>Plaintiff's Brief</u>, p. 8 n. 4; although her email to Walls states that she had changed the meeting to Thursday even
(continued...)



Plaintiff's Deposition, Exhibit 29.  When Plaintiff saw Walls in the hall shortly after she rescheduled the meeting, she verbally informed him of her actions, the reason, and that she would be happy to reschedule again if that did not work for his schedule, which appeared to be empty.  Plaintiff's Deposition, p. 312.

Walls met with Plaintiff the next day, November 10, and expressed concern over the fact that Plaintiff had changed the meeting without checking with him.  Plaintiff's Deposition, p. 309. He also reminded her that the conditions stated in her mid-year performance appraisal dated August 13, 2010, were still in place.  Plaintiff's Deposition, pp. 307-308, Exhibit 28.  Walls emphasized during this meeting that "[i]mmediate and lasting improvement is expected in your performance; specifically in relationships and being a team player."  Plaintiff's Deposition, Exhibit 28.

On November 16, 2010, a weekly HR flash meeting was held.  Plaintiff's Deposition, p. 314.  At this meeting, Plaintiff testified that she stood in the doorway and did not sit in a chair around the table.  Plaintiff testified that she did not sit down because her neck was hurting, she had had a rough night the evening before, and it helped ease her pain to hold her neck against the wall. Plaintiff's Deposition, p. 314.  Walls was not happy that Plaintiff did not come into the meeting room and participate in a meaningful way, even when he directed a question to her and attempted to engage her in the conversation.  Plaintiff's Deposition, pp. 314-316; Walls Deposition, pp. 35-36.  During the meeting, a proposed company team bowling event was discussed.  When Walls asked Plaintiff if she was okay with that scheduling and with attending the bowling party, she responded that she was.  Plaintiff's Deposition, pp. 315-316.  However, Plaintiff testified that she had previously

_____

[10](...continued)
though the "schedule looked blocked out for vacation . . . ."  Plaintiff's Deposition, Exhibit 29.

informed Walls that she was not permitted to lift anything larger than a milk jug due to a medical condition, and she was concerned that the whole team would go bowling and she would not be able to participate based on her medical condition. Plaintiff's Deposition, p. 315. Plaintiff did not, however, openly discuss her concerns, testifying that she was reluctant to voice her concerns with Walls during the meeting. Plaintiff's Deposition, p. 316.

The following day, Plaintiff had an attorney write a letter to Walls informing him that he had been retained to represent Plaintiff because she was being subjected to illegal employment action on the job, although the letter did not specify what type of illegal employment action had purportedly occurred. See Plaintiff's Memorandum in Opposition to Summary Judgment, Exhibit A. Thereafter, on November 22, 2010, Plaintiff returned to work full-time from FMLA leave without restrictions. See Defendants' Response No. 8 to Plaintiff's Request to Admit. On December 1, 2010, Walls and Schwartz called Plaintiff in for a meeting, where she was terminated. Plaintiff's Deposition, p. 313; and attached Exhibit 30.

Plaintiff then filed this lawsuit asserting claims for gender discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), et seq. (First Cause of Action); discrimination and retaliation in violation of the Americans With Disabilities Act, as amended by the ADA Amendments Act of 2008 ("ADAAA"), 42 U.S.C. § 12101, et seq. ("ADA") (Second Cause of Action); retaliation in violation of the Fair Labor Standards Act, 29 U.S.C. § 215(a)(3) ("FLSA"), the Age Discrimination in Employment Act, 29 U.S.C. § 623, et seq ("ADEA"), and the ADA[11] (Third Cause of Action); interference with, and retaliation for exercising her rights

---

[11]This is a separate claim based on different facts than the ADA retaliation claim set forth in Plaintiff's second cause of action.

12

under the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 et seq. ("FMLA")(Fourth Cause

of Action); breach of contract (Sixth[12] Cause of Action); breach of implied covenant of good faith and

fair dealing (Seventh Cause of Action); the Equal Pay Act, 29 U.S.C. 206(D), et seq. ("EPA")(Eighth

Cause of Action); and promissory estoppel (Ninth Cause of Action).

## Discussion

Defendants seek summary judgment on all of Plaintiff's claims, while Plaintiff seeks

summary judgment on her FMLA interference claim.   Summary judgment "shall be rendered

forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together

with the affidavits, if any, show that there is no genuine issue as to any material fact and that the

moving party is entitled to judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. The moving party

has the burden of proving that judgment on the pleadings is appropriate.   Once the moving party

makes this showing, however, to survive summary judgment the opposing party must respond to the

motion with "specific facts showing there is a genuine issue for trial." Rule 56(e), Fed.R.Civ.P.

## I.

## Individual Liability Under Title VII, ADEA and ADA

Plaintiff has alleged all of her causes of action against Life Cycle as well as against

all four (4) of the named natural Defendants.  However, with regard to Plaintiff's claims under Title

VII, the ADEA, and the ADA, there is no individual liability under those statutes.  See Lissau v.

---

[12]This action was originally filed in the Court of Common Pleas for the County of Charleston
and was removed to this Court on April 6, 2012, after Plaintiff filed an amended Complaint in state
court.  In her response in opposition to summary judgment, Plaintiff agreed to concede her claim for
defamation (Fifth Cause of Action) which was only asserted against Defendants Life Cycle and Greg
Walls.  See Memorandum in Opposition to Summary Judgment, p. 35.  Plaintiff's counsel also
confirmed in an email to the Court and opposing counsel that Plaintiff was abandoning her
defamation claim. Each of Plaintiff's remaining claims are against all of the Defendants.



13

Southern Food Servs, Inc., 159 F.3d 177, 180-181 (4th Cir. 1989); Jones v. Sternheimer, No. 09-2242,

2010 WL 2711305 at * 2 (4th Cir. July 6, 2010); Spell v. Maryland Human Relations Com'n, No. 11-

0803, 2011 WL 6000862 at *5 (D.Md. Nov. 28, 2011)[Court *sua sponte* dismissed two individual

defendants from action due to no individual liability under Title VII]; Barbosa v. Baxter Healthcare

Corp., No. 00-1546, 2000 WL 1739309 at * 2 (D.Puerto Rico Nov. 15, 2000)[same]; Albra v.

Advan, Inc., 490 F.3d 826, 830 (11th Cir. 2007)[No individual liability under the ADA]; Birbeck v.

Marvel Lightning Corp., 30 F.3d 507, 510-511 (4th Cir. 1994)[no individual liability under the

ADEA].

  Therefore, each of the natural Defendants should be dismissed as party Defendants

from Plaintiff's first, second, and third (with regard to allegations of retaliation under the ADA and

ADEA) causes of action.[13]

## II.

### Title VII Disparate Treatment Claim

  Plaintiff's disparate treatment claim in her First Cause of Action is that she was

discriminated against on the basis of her sex when she was terminated by the Defendant Life Cycle.

See Plaintiff's Brief, pp. 21-22. This claim requires proof of intentional discrimination, either by

direct evidence or by the structured procedures set forth in McDonnell Douglas Corp. v. Green, 411

---

[13]With respect to Plaintiff's claim under the FLSA in her Third Cause of Action, the possibility of individual liability under the FLSA is discussed in Section IV of this opinion, infra, covering the merits of Plaintiff's FLSA retaliation claim. As for the FMLA, whether there is individual liability for individuals in the private sector under the FMLA [Fourth Cause of Action] is addressed in Section V, infra. See Jones v. Sterhneimer, CEO, 387 Fed.Appx. 366, 368-369 (4th Cir. July 6, 2010)[Whether the FMLA imposed liability on the employee supervisors in their individual capacity was still open in the Fourth Circuit]; Reed v. Maryland Dep't of Human Resources, No. 12-472, 2013 WL 489985 at * 7 (D.Md. Feb. 7, 2013)[same]; see also discussion, infra.



U.S. 792 (1973). Plaintiff has not offered any direct evidence of gender discrimination,[14] and Life Cycle argues that Plaintiff has failed to present sufficient circumstantial evidence to create a genuine issue of fact as to whether her termination occurred because of her sex under the McDonnell Douglas proof scheme to survive summary judgment.

The United States Supreme Court articulated a three-part formula for analyzing discrimination cases in McDonnell Douglas. First, Plaintiff must establish a prima facie case of discrimination. If a prima facie case is established, a rebuttable presumption is created that the Defendant unlawfully discriminated against her. Second, once this presumption has been established, the burden of production shifts to the Defendant to show a legitimate, non-discriminatory reason for its actions. Third, if the Defendant shows a legitimate, non-discriminatory reason for its actions, the burden is then on the Plaintiff to come forward with evidence that the Defendant's asserted reasons for its actions are a mere pretext for its true discriminatory motives, and that the actions of the Defendant were really based on Plaintiff's sex. McDonnell Douglas Corp., 411 U.S. at 802-805; Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 252-256 (1981); Conkwright v.

---

[14]Although Plaintiff contends that she has offered direct evidence of gender discrimination, the undersigned does not agree. Direct evidence of discrimination is evidence which, if believed, would prove the existence of a fact without any inferences or presumptions. O'Connor v. Consolidated Coin Caterers Corp., 56 F.3d 542, 548-549 (4th Cir. 1995), rev'd on other grounds, 517 U.S. 308 (1996); Black's Law Dictionary, 460 (6th Ed. 1990) (citing State v. McClure, 504 S.W.2d 664, 668 (Mo.Ct.App. 1974)); see Williams v. General Motors Corp, 656 F.2d 120, 130 (5th Cir. 1981), cert. denied, 455 U.S. 943 (1982). Plaintiff states that Walls told her that Life Cycle was a "traditional" company and that anyone could see that women were not treated equally within the Company by the way Jim Fei treated his wife. Plaintiff's Deposition, pp. 256-258. This statement by Walls (assumed to be true for purposes of summary judgment) is not direct evidence that Plaintiff was terminated because she is a female. There is no testimony or other evidence providing any specifics with regard to Fei's alleged treatment of his wife, there is no evidence regarding Fei's treatment of employees (including Plaintiff), and Walls' conclusory reference to Plaintiff needing to observe and make conclusions about how Jim Fei treated his wife does not translate to direct evidence that Plaintiff was terminated from her job because of her gender.



Westinghouse Elec. Corp., 933 F.2d 231, 234-235 (4th Cir. 1991). Despite these shifting burdens of production, however, Plaintiff retains the ultimate burden of persuasion on the issue of discrimination throughout. Texas Dep't of Community Affairs, 450 U.S. at 252-253; see also St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507 (1993).

In order to meet the first prong of the McDonnell Douglas formula and establish a prima facie case of sex discrimination, Plaintiff must show (1) that she is a member of a protected class; (2) that she was performing her job satisfactorily; (3) that she was subjected to an adverse employment action (here - termination); and (4) that she was replaced by someone outside of her protected class, or there is some other evidence giving rise to an inference of unlawful discrimination. See generally, Austen v. HCA Health Services of Virginia, Inc., No. 00-2359, 2001 WL 242203 at **1 (4th Cir. Mar. 12, 2001); Hughes v. Bedsole, 48 F.3d 1376, 1383 (4th Cir. 1995), cert. denied, 516 U.S. 870 (1995). See also Gilbert v. Penn-Wheeling Closure Corp., 917 F.Supp. 1119, 1125 (N.D.W.Va. 1996). It is undisputed that Plaintiff is a member of a protected class, and that she was subjected to an adverse employment action when she was terminated. Therefore, Plaintiff has met the first two (2) prongs of her prima facie case. However, Life Cycle disputes that Plaintiff was performing her job satisfactorily, or that her termination occurred under circumstances giving rise to an inference of discrimination. The undersigned is constrained to agree.

**Job Performance**. With regard to Plaintiff's performance, the evidence reflects that in October 2009 Walls discussed with Plaintiff negative feedback the Defendant had received from third parties on the company's performance review initiative and recruiting process, both areas of Plaintiff's responsibility. Walls' 30(b)(6) Deposition, pp. 73-74; Plaintiff's Deposition, pp. 205-206, 208. Walls shared with Plaintiff that she was overloading managers with too much information about



16

the various processes and that there were complaints about some of the training she had done. Walls' 30(b)(6) Deposition, pp. 73-74.[15] He also told her that she needed to have a better understanding of processes before rolling them out. Walls' 30(b)(6) Deposition, pp. 73-74. Plaintiff walked out of this meeting, telling Walls that she was not feeling well and would like to talk about it later. Plaintiff's Deposition, pp. 206, 209, 212. Walls believed Plaintiff was very defensive about the QAR feedback and unwilling to accept constructive criticism about issues in her areas of responsibility; Walls' 30(b)(6) Deposition, p. 74; and Plaintiff confirms that Walls felt there were problems in the Human Resources office, particularly between him and Plaintiff, as well as between Plaintiff and Sonya Brookshire. Plaintiff's Deposition, p. 217. Cf. Beall v. Abbott Labs, 130 F.3d 614, 619 (4th Cir. 1997)[In considering whether a claimant was adequately performing their job, it is the perception of the decision maker which is relevant, not the self assessment of the claimant].

On January 8, 2010, Walls told Plaintiff during a meeting that it was clear to him that she had a problem working for him and he wanted her to exit the company. Plaintiff's Deposition, p. 230. Walls also shared with Plaintiff his concerns regarding her defensiveness related to the QAR feedback, that he was concerned about a confrontation that had occurred between Plaintiff and Jennifer Ash, another employee, in November, and issues relating to a performance management communication that had gone out in December. Plaintiff's Deposition, pp. 246-247. While Plaintiff offers various explanations or defenses for her conduct and work performance, she does not dispute that those events occurred (albeit with her disagreeing as to whether she was at fault or to blame), and it was clear even to Plaintiff that Walls, from his perspective, felt there were problems with her

---

[15]Plaintiff testified that the individuals who had been interviewed for this survey did not actually have negative things to say about her performance. Plaintiff's Deposition, pp. 206-208. However, she has provided no evidence to support this claim.

17

performance and with their working relationship, although Plaintiff attributed these problems to "retaliation". Plaintiff's Deposition, p. 247. See Holifield v. Reno, 115 F.3d 1555, 1565 (11th Cir. 1997)[inquiry centers upon the employer's beliefs, and not the employee's own perception of [her] performance]. Plaintiff also testified that she told Walls that people thought he was an "idiot", and that she had discussions with another employee about how she felt Walls did not know his job and was not doing a good job. Plaintiff's Deposition, pp. 233-234, 237-238. As a result of a meeting Plaintiff then had with Jim Fei, Plaintiff testified that her "understanding" was that there was a need for she, Walls, and Brookshire to try harder to work together to get through some of their differences, although Plaintiff testified she did not have any problems with Brookshire. Plaintiff's Deposition, p. 263.

Thereafter, in Plaintiff's performance appraisal of February 11, 2010, Plaintiff received a mark of "2", indicating "not meeting expectations", in the area of "Interpersonal Relationships." Plaintiff's Deposition, Exhibit 17 [000015].[16] On June 2, 2010, Plaintiff was issued a performance improvement template with several areas of concern outlined. Plaintiff's Deposition, Exhibit 18. It was noted specifically that Plaintiff's performance was a problem and "that if Plaintiff's performance did not improve, a written warning would be the next step." Plaintiff's Deposition, Exhibit 18. Plaintiff then received her mid-year performance appraisal on or about August 13, 2010; Plaintiff's Deposition, p. 286. Exhibit 20; where Plaintiff recalls Walls telling her that he did not like how she was treating him. Walls rated Plaintiff as "not meeting expectations" in the area of working with Walls and Brookshire, along with listing various other problems. Plaintiff's Deposition, Exhibit 20 [000022, 000024 & 000025]; Plaintiff's Deposition, p. 287. Walls noted in

---

[16]Plaintiff's evaluation was signed by Walls, and then signed off on as approved by Fei.

this appraisal that Plaintiff's

> relationship and teamwork must improve with others, especially with me, and other members of the CSG Leadership Team. Your insistence that things go your way and your refusal to accept feedback and responsibility must improve . . . . These same significant performance deficiencies have been discussed with you on a number of occasions with little or no improvement. If you do not immediately meet these expectations, and make lasting improvement, you will leave us no other alternative but to terminate your employment . . . .

Plaintiff's Deposition, Exhibit 20 [000026].

In addition to this evidence, additional evidence shows that when Plaintiff returned from FMLA leave in November 2010, she rescheduled a meeting that had been set by Walls without his prior approval (and during a time blocked for vacation on the schedule); Plaintiff's Deposition, Exhibit 29; following which Walls expressed his displeasure with her doing so and emphasized that immediate and lasting improvement was expected in her performance, specifically in relationships and being a team player. Plaintiff's Deposition, pp 307-308, and attached Exhibit 28. Then, on November 16, 2010, Plaintiff and Walls had a difference of opinion over whether she effectively or properly participated in a meeting. Plaintiff's Deposition, pp. 314-316; Walls Deposition, pp. 35-36. Plaintiff was fired approximately two weeks later.

This record clearly reflects that, even by Plaintiff's own testimony, Walls and Plaintiff had difficulty working together, that Walls was dissatisfied with her work performance, and that Plaintiff was not performing her job to the Defendant's satisfaction. Beall, 130 F.3d at 619 [In considering whether a claimant was adequately performing their job, it is the perception of the decision maker which is relevant, not the self assessment of the claimant]; Holifield, 115 F.3d at 1565 [inquiry centers upon the employer's beliefs, and not the employee's own perception of [her] performance]; King v. Rumsfeld, 328 F.3d 145, 149 (4th Cir. 2003)[On a motion for summary



judgment, a Plaintiff's "own testimony . . . cannot establish a genuine issue as to whether [the Plaintiff] was meeting [the employer's] expectations."]. Therefore, Plaintiff has failed to establish a genuine issue of fact as to whether she was satisfactorily performing her job at the time of her termination in December 2010.

**Inference of Discrimination**. With regard to the fourth prong of her prima facie case, Plaintiff does not make any assertion that she was replaced by a male, nor has she presented any evidence to show in any way that the decision to terminate her employment was based on her gender. Boden v. U.S. Amada Ltd., 978 F.Supp. 657, 659 (E.D.N.C. 1997) [former employee's own subjective belief and conclusory statements that he had been discriminated against are not sufficient to raise reasonable inference of unlawful discrimination]. Walls, who (along with Schwartz) was the one who met with Plaintiff to terminate her, was also the one who initially interviewed and recommended Plaintiff for the job when she was hired, and Plaintiff has presented no evidence to show that Walls had ever made any gender-based discriminatory statements as to how he felt[17], discriminated against females in general, or had or ever displayed any discriminatory animus whatsoever. Indeed, Walls not only was involved in hiring Plaintiff in the first place, but wanted her to replace him. See Jeter v. SMI-Owen Steel Co, Inc., No. 95-0001, 1996 WL 906531 at *4 (D.S.C. Sept. 30, 1996)(citing Proud v. Stone, 945 F.2d 7956, 798 (4th Cir. 1991)); Jiminez v. Mary Washington College, 57 F.3d 369, 378 (4th Cir.) ["[E]mployers who knowingly hire workers within a protected group seldom will be credible targets for charges of pretextual [adverse employment actions".], cert. denied, 516 U.S. 944 (1995)]; Buhrmaster v. Overnight Transp. 61 F.3d 461, 464 (6th

---

[17]Plaintiff's only statement which she attributes to Walls was that he made a statement about how Jim Fei treated his spouse. There are no statements reflecting any sexual or discriminatory animus on the part of Walls.

20



Cir. 1995) ["[A]n individual who is willing to hire and promote a person of a certain class is unlikely to fire them simply because they are a member of that class."], cert. denied, 516 U.S. 1078 (1996). Furthermore, Plaintiff testified that Walls had disclosed to her in the fall of 2008 that he had discussed his plan of retiring and promoting her to his position, and that both Bob and Jim Fei were "on board" with the plan. Plaintiff's Deposition, p. 91. No inference of a discriminatory animus based on Plaintiff's gender can be derived from this evidence.

While Plaintiff argues that Walls also received a score of "2" in Interpersonal Relationships during his February 10, 2010 performance evaluation (a claim assumed to be true for proposes of this opinion, although Walls' evaluation has not been provided as an exhibit), but was not terminated; Plaintiff's Deposition, p. 271; this is not evidence of gender discrimination. Plaintiff was not terminated because she received a score of "2" in Interpersonal Relationships on her performance appraisal. Rather, Plaintiff was terminated approximately ten (10) months *later,* after subsequent warnings, additional alleged performance issues, and an additional negative evaluation. There is no evidence in the record as to Walls' evaluations or performance after the February 10, 2010 performance evaluation. Finally, while Plaintiff also argues that Life Cycle in general had a discriminatory atmosphere; see Arnette Deposition, pp. 80-81;[18] Plaintiff was herself hired for a high level position, and was even given a raise by the Defendant to keep her from leaving the company.

---

[18]To suport this contention, Plaintiff has submitted excerpts from the deposition of former Life Cycle employee Patricia Arnette, who testified that she believed Life Cycle had a "glass ceiling" mentality. Arnette Deposition, pp. 80-81. However, no specifics or other evidence of gender discrimination are provided to support this general and conclusory testimony. House v. New Castle County, 824 F.Supp. 477, 485 (D.Md. 1993) [Conclusory allegations insufficient to maintain claim].



21

Plaintiff has provided no evidence to demonstrate, or from which this Court could infer, a gender animus on the part of Walls, or to show that the reason she was terminated by Life Cycle was because of her gender. Therefore, this claim should be dismissed. Gairola v. Virginia Dep't of General Services, 753 F.2d 1281, 1288, n. 4 (4th Cir. 1985) [a case should be dismissed "...when the only evidence in support of the plaintiff's...case is based on unfounded conjecture...that [her] disfavorable treatment was the result of discrimination...."]; Rucker v. Greenville Co. Sheriff Dep't., No. 10-1533, 2012 WL 951789, * 2 (D.S.C. March 20, 2012)[Conclusory allegations or denials, without more, are insufficient to preclude the granting of a summary judgment motion]; Cook v. CSK Transp. Corp., 988 F.2d 507, 513 (4th Cir. 1993) ["[U]nsupported allegations do not establish a prima facie case of [ ] discrimination...."]; see also, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-252 (1986)[there must be evidence on which a jury could reasonably find for the Plaintiff].

### Title VII Retaliation Claim

With respect to her retaliation claim in her First Cause of Action, Section 704(a) of Title VII, 42 U.S.C. § 2000(e)-3(a)[setting forth the standard for a retaliation claim], provides as follows:

> It shall be an unlawful practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicants for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

Retaliation cases under Title VII are subject to the same requirements of proof as are applicable to

22

disparate treatment claims. <u>Ross v. Communications Satellite Corp.</u>, 759 F.2d 355, 365 (4th Cir.

1985) <u>overruled on other grounds</u>, <u>Price Waterhouse v. Hopkins</u>, 490 U.S. 228 (1989); <u>see also</u>

<u>Williams v. Cerberonics, Inc.</u>, 871 F.2d 452, 457 (4th Cir. 1989). The employee is initially required

to establish a prima facie case of retaliation by a preponderance of the evidence. Such a prima facie

case consists of three elements: (1) the employee engaged in protected activity; (2) the employer took

adverse action against the employee; and (3) a causal connection existed between the protected

activity and the adverse action. <u>Id.</u>; <u>Munday v. Waste Management of North America, Inc.</u>, 126 F.3d

239, 242 (4th Cir. 1997). Once a prima facie case has been presented, the Defendant employer has

the burden of producing a legitimate, non-discriminatory reason for its actions. If the employer can

produce a legitimate, non-discriminatory reason for its actions, the employee must then demonstrate

that the Defendant's proffered reason is pretextural. <u>Id.</u>

Although Plaintiff lists retaliation under Title VII in the heading in her memorandum

in opposition to summary judgment, she fails to present any arguments regarding retaliation in that

section. However, Plaintiff was terminated (an adverse employment action), and she does reference

in the pretext section of her disparate treatment claim that she allegedly made certain complaints

including disparate workloads being given to two females in an anonymous internal employee survey.

<u>See</u> <u>Plaintiff's Memorandum in Opposition</u>, p. 21. The undersigned also found a reference in Walls'

notes from their January 8, 2010 meeting where Plaintiff apparently discussed "LCE's and

management's attitude toward women.[19]" <u>See</u> <u>Plaintiff's Memorandum in Opposition</u>, Exhibit 3.

---

[19]Walls testified that during their meeting in January 2010, Plaintiff attempted to deflect from the discussion of her performance problems and said that she believed her problems were because of certain comments she had made and management's attitude toward women. <u>Walls Deposition</u>, p. 76. However, no further details regarding this conversation and/or any discussions that were had on
(continued...)

Finally, Plaintiff also contends that on that same day she relayed to Jim Fei comments made by Walls about Fei's treatment of his wife and that Life Cycle was a "traditional" company. Considered in the light most favorable to the Plaintiff, this evidence is sufficient to show that Plaintiff engaged in protected activity when she complained to Jim Fei about comments she alleges Walls told her about Life Cycle's treatment of women and when she complained to Walls about management's attitude towards women.[20]  Bowman v. Holopack Intern. Corp., No. 06-1648, 2007 WL 4481130 at * 14 (D.S.C. Dec. 19, 2007)["[T]he opposition clause encompasses informal protests, such as voicing complaints to superiors or protests using an employer's grievance procedures."]; see also Rodas v. Town of Farmington, ___ F.Supp.2d ___, 2013 WL 178152 at * 5 (W.D.N.Y. Jan. 16, 2013)["'Protected activity' includes opposing employment practices that are prohibited under Title VII (such as discrimination based on . . . sex . . .), or making a charge of discrimination, or participating in any investigation, proceeding, or hearing arising under Title VII."].  Plaintiff also meets the second prong of the retaliation prima facie case since was subjected to an adverse employment action when she was terminated from her employment. Ainsworth v. Loudon County School Bd., 851 F.Supp.2d 963, 976 (E.D.Va. 2012)["Adverse employment actions are those that

_____

[19](...continued)
this topic are provided.

    [20]With regard to Plaintiff's allegation about reporting disparate workloads for two female employees on an anonymous survey, Plaintiff only cites to page 237 of her deposition for support of this allegation. However, that page only refers to Plaintiff complaining about her hours and workload and that she would like to get some help. The issue of gender is not discussed. Plaintiff's Deposition, p. 237. Although Plaintiff also testified that another female agreed with her about Walls' performance and work habits, her deposition testimony does not show that she complained about this individual's work load on her survey, or that her complaint about her own workload was gender based. Id. Therefore, this allegation of protected activity has not been considered, as it has no evidentiary support.

negatively impact the terms, conditions, or benefits of employment, . . . ., termination being the quintessential example . . . ."].

However, with respect to whether the evidence establishes a causal connection between Plaintiff having engaged in protected conduct and her discharge, the undersigned finds and concludes that the evidence is not sufficient to create a factual question on this issue sufficient to survive summary judgment. Considered in the light most favorable to the Plaintiff, the evidence shows that Plaintiff engaged in activity that could be construed as complaining about the company's treatment of women on January 8, 2010. <u>Plaintiff's Deposition</u>, pp. 256-258, 263; <u>Walls Deposition</u>, pp. 76-77. However, the evidence reflects that Plaintiff had already been counseled by Walls about performance deficiencies prior to that time. Prior to Plaintiff telling Fei about Walls' comment about his treatment of his wife and that there was no place for females in the organization (notwithstanding Plaintiff's own highly paid position with the Company), Walls had already met with the Plaintiff in an attempt to get her to leave and offered her a severance, a meeting at which Plaintiff told Walls (her boss) that fellow employees thought, among other things, that he was an "idiot," although she said she did not. In fact, as early as October 2009 Walls had expressed concerns about Plaintiff's attitude toward him and her performance. Further, while Plaintiff points out that she received a "2" on her performance evaluation the month following her January 8, 2010 protected activity, Walls also received a score of "2" in Interpersonal Relationships during his February 10, 2010 performance evaluation. <u>Plaintiff's Deposition</u>, p. 271. Accordingly, the evidence shows that they were both rated the same in that area at that time.

The evidence also shows that Plaintiff's performance, and in particular her relationship with Walls, continued to deteriorate after that time as discussed herein above. However, there is no



evidence to show that Plaintiff's termination some ten (10) months later, after multiple warnings, continued acrimony between Plaintiff and her boss, and alleged performance problems, had anything to do with her January 8, 2010 comments to Walls and Jim Fei. This evidence is not sufficient to establish a causal connection between Plaintiff's protected activity and her discharge. See Dowe v. Total Action Against Poverty in Roanoke Valley, 145 F.3d 653, 657 (4th Cir. 1998) [Plaintiff "must have evidence from which a reasonable factfinder could conclude that a causal connection exists between the protected activity and the adverse action(s)"].

Plaintiff's only real argument of a causal connection is the obvious fact that her termination occurred after she had engaged in the protected activity, even though it was some ten (10) months later. However, even assuming arguendo that this fact alone is sufficient to establish a prima facie case of retaliation (which the undersigned expressly does not find), her claim still would not survive summary judgment. As previously discussed herein, supra, the Defendant's evidence reflects that Plaintiff's termination was the result of a conflict between Plaintiff and her immediate supervisor, Walls, and that she was not performing her job satisfactorily. See discussion, supra. This evidence establishes a legitimate, non-discriminatory reason for the Defendant's actions. See EEOC v. Clay Printing Co., 955 F.2d 936, 941 (4th Cir. 1991) [The Defendant's burden of establishing a legitimate, non-discriminatory reason is only one of production, not of persuasion]. Therefore, for this claim to proceed, Plaintiff would have to have sufficient evidence of pretext to survive summary judgment on this claim. Cf. University of Texas Southwestern Medical Center v. Nassar, No. 12-484, 2013 WL 3155234 at **13-16 (2013)["Title VII retaliation claims must be proved according to traditional principles of but-for causation, not the lessened causation test stated in §2000e-2(m). This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged



26

wrongful action or actions of the employer."].  Plaintiff has failed to present any such evidence.

The evidence clearly shows that before Plaintiff allegedly engaged in protected activity in January 2010, Walls had already attempted to get Plaintiff to leave Life Cycle's employment, independent of any protected activity, due to their increasingly acrimonious relationship. Furthermore, both Plaintiff and Walls received the same employee assessment rating, while Plaintiff's performance issues continued to thereafter be documented, including events that Plaintiff does not dispute occurred.  Therefore, Plaintiff has not shown that but-for her comments to Walls and/or Fei in January 2010, she would not have been terminated some ten (10) months later by the same individual who interviewed her and recommended for her to not only be hired, but to take his place if he retired.  Nassar, supra; see also Andrews v. Staples the Office Superstore East, Inc., No. 11-37, 2013 WL 3324227 at * 13 (W.D.Va. July 1, 2013)["[A] Title VII retaliation plaintiff must establish that 'her protected activity was a but-for cause of the alleged adverse action by the employer,' and not merely a 'motivating factor.'](quoting University of Texas Southwestern Medical Center, 2013 WL 3155234 at *16).  While Plaintiff obviously disagrees with the personnel action taken against her, in order to succeed on her Title VII retaliation claim, Plaintiff's evidence must show (or at least raise an inference) that the reason she was discharged was because she engaged in protected activity, not because the Defendant made a mistake, was incorrect in its findings concerning Plaintiff's employment, or even that her supervisor just did not like her.  See generally Jamil v. Secretary Dep't of Defense, 910 F.2d 1203, 1207–1208 (4th Cir.1990); Holder v. Raleigh, 867 F.2d 823, 828 (4th Cir.1989); Crowley v. Prince George's County, 890 F.2d 683, 687 (4th Cir.1989), cert. denied,111 S.Ct. 101 (1992); McCollum v. Bolger, 794 F.2d 602, 610 (11th Cir.1986), cert. denied, 479 U.S. 1034, 107 S.Ct. 883; see generally Moore v. Sears, Roebuck & Co., 683 F.2d 1321, 1323, n. 4 (11th



27

Cir.1982); <u>Jones v. Orleans Parish School Board</u>, 679 F.2d 32, 38 (5th Cir.1982), <u>cert. denied</u>, 461

U.S. 951 (1983); <u>North Carolina Dep't of Corrections v. Gibson</u>, 301 S.E.2d 78, 85 (N.C.1983);

<u>Sullivan v. River Valley School District</u>, 197 F.3d 804, 815 (6th Cir.1999), <u>cert. denied</u>, 530 U.S.

1262 (2000) [Without a showing that those other reasons were discriminatory, [Plaintiff] cannot

establish a prima facie case for relief ....]; <u>cf</u>. <u>Kariotis v. Navistar Intern. Transp. Corp.</u>, 131 F.3d 672,

680 (7th Cir.1997) [Discrimination statutes allow employers to discharge employees for almost any

reason whatsoever (even a mistaken but honest belief) as long as the reason is not illegal

discrimination]. Thus when an employee is discharged because of an employer's honest mistake,

federal anti-discrimination laws offer no protection."]; <u>see</u> <u>Dowe v. Total Action Against Poverty in</u>

<u>Roanoke Valley</u>, 145 F.3d 653, 657 (4th Cir.1998); <u>Rudolph v. Hechinger</u>, 884 F.Supp. 184, 188

(D.Md.1995)["Title VII (does) not protect against unfair business decisions—only against decisions

motivated by unlawful animus"], citing <u>Turner v. Texas Instruments, Inc.</u>, 555 F.2d 1251, 1257 (5th

Cir.1977).

      Plaintiff has failed to present any such evidence. Therefore, the Defendant's motion

for summary judgment with regard to Plaintiff's Title VII retaliation claim should be granted.

<u>University of Texas Southwestern Medical Center</u>, 2013 WL 3155234 at **13-16; <u>Andrews</u>, 2013

WL 3324227 at * 13.

### III.

### <u>ADA Claim</u>

      Plaintiff asserts in her Second Cause of Action that when she was terminated she was

both discriminated against on the basis of a disability in violation of the ADA, and that she was

retaliated against for engaging in protected activity under the ADA. In order to maintain a claim



28

under the ADA, Plaintiff must present evidence to show that 1) she is a qualified person with a disability under the ADA, and 2) that the defendant is subject to suit under that statute. 42 U.S.C. § 12112(a); see Pollard v. High's of Baltimore, Inc., 281 F.3d 462, 467 (4th Cir. 2002), cert. denied, 123 S.Ct. 122 (2002); Tyndall v. National Education Centers, 31 F.3d 209, 212 (4th Cir. 1994); Hooven-Lewis v. Caldera, 249 F.3d 259, 268 (4th Cir. 2001) [same standards apply to ADA and Rehabilitation Act].[21] Defendant does not contest for purposes of summary judgment that Plaintiff is a "qualified" person with a disability,[22] or that the Defendant Life Cycle[23] is subject to suit under the ADA.

**Discrimination Claim**. The ADA prohibits an employer from "discriminat[ing] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other

---

[21]While some cited cases deal with the Rehabilitation Act rather than the ADA, the standards are the same. Smaw v. Commonwealth of Virginia Department of State Police, 862 F.Supp. 1469, 1474 (E.D.Va. 1994) ["By design, the ADA standards mirror those of the Rehabilitation Act in this case....The emergence of the ADA does not create a new avenue for claims in the area of disability discrimination; rather, the ADA incorporates the existing language and standards of the Rehabilitation Act in this area."]; Hooven-Lewis v. Caldera, 249 F.3d at 268.

[22]The term "disability" is defined as a) a physical or mental impairment that substantially limits one or more of the major life activities of an individual, b) a record of such impairment, or c) being regarded as having such an impairment. 42 U.S.C. § 12102(1); Pollard, 281 F.3d at 467. A "major life activity" is defined as a basic activity that an average person can perform with little or no difficulty, such as walking, hearing, speaking, learning, breathing, standing, lifting, seeing and working. Appendix to 29 C.F.R. § 1630.2(i). Plaintiff alleges that she has a "disability" which includes ongoing intercranial hypertension, pseudo tumor cerebri, and spinal stenosis with disc compression and herniation. See Amended Complaint, ¶ 140. For purposes of summary judgment, the Defendant does not contest that Plaintiff has been afflicted by these conditions or that they meet the definition of a disability under the ADA.

[23]For the reasons previously stated, the four (4) natural Defendants are not subject to suit under Plaintiff's ADA claim.

terms, conditions, and privileges of employment". 42 U.S.C. § 12112(a). Because Petitioner's claim

arose in 2010, after the effective date of the ADAAA, those amendments also apply to her claim.[24]

To establish a prima facie case of wrongful discharge under the ADA, Plaintiff must show that (1)

she is within the ADA's protected class; (2) she was discharged; (3) at the time of discharge, she was

performing her job at a level that met her employer's legitimate expectations; and (4) her discharge

occurred under circumstances that raise a reasonable inference of unlawful discrimination.    See

Reynolds v. Am. Nat'l Red Cross, 701 F.3d 143, 150 (4th Cir. 2012); Roham v. Networks

Presentations LLC, 375 F.3d 266, 273 n. 9 (4th Cir. 2004); Haulbrook v. Michelin N. Am., 252 F.3d

696, 702 (4th Cir. 2001); Harris v. Eston Hospital Center, LLC, No. 12-1544, 2013 WL 1749538 at

*6 (4th Cir. Apr. 24, 2013).

   As noted, Life Cycle does not contest that Plaintiff is within the ADA's protected

class, and it is also uncontested that Plaintiff was discharged.  Therefore, Plaintiff meets the first and

second prongs of her ADA prima facie case.  However, Defendant contends that Plaintiff was not

performing her job satisfactorily at the time that she was discharged, and that there is also no evidence

to support an inference that she was discharged due to a disability.  The undersigned agrees.

   First, the evidence of Defendant's problems with Plaintiff's performance prior to her

---

[24]Congress made substantial changes to the ADA through the ADA Amendments Act of 2008 ("ADAAA"), which has an effective date of January 1, 2009. "The ADAAA was intended to clarify congressional intent with respect to the original ADA, as well as to overturn certain United States Supreme Court cases that had narrowed the ADA's scope;" Ryan v. Columbus Regional Healthcare System, Inc., No. 10-234, 2012 WL 1230234 at * 3 (E.D.N.C. Apr. 12, 2012); and under the ADAAA, "[t]he definition of disability . . . shall be construed in favor of broad coverage of individuals . . . , to the maximum extent permitted by the terms of this chapter." 42 U.S.C. § 12102(4)(A). Further, "[t]he primary purpose of the ADAAA is to make it easier for people with disabilities to obtain protection under the ADA." 29 C.F.R. § 1630.1 (2011). Since Plaintiff lost her job on December 1, 2010, these amendments apply to her ADA claim.

taking FMLA leave due to a medical condition[25] are well documented in the record and have been previously discussed, supra. Plaintiff went out on full-time FMLA leave on or about August 19, 2010. Upon return from leave on November 8, 2010, Plaintiff was restricted to working four to six hours, with a return to full-time work on November 22, 2010. Plaintiff's Deposition, p. 307; Court Docket No. 22-5; Defendant's Response No. 8 to Plaintiff's Request to Admit. Walls met with Plaintiff two days after she returned and reminded her that the conditions stated in her mid-year performance appraisal dated August 13, 2010, were still in place and that "[i]mmediate and lasting improvement [was] expected in [her] performance; specifically in relationships and being a team player." Plaintiff's Deposition, pp. 307-308, Exhibit 28. As previously discussed, two more events occurred after Plaintiff returned from her leave that led to further friction between Plaintiff and Walls. See discussion, supra; Plaintiff's Deposition, pp. 309, 312, 314-316; Exhibits 29 & 30; Walls Deposition, pp. 35-36.

Although Plaintiff argues that the incident involving the re-scheduled meeting arose out of Walls trying to keep her from attending or interfering with her doctor's appointment or potentially to punish her because of her need for the appointment, there is no evidence to support such a finding. Rather, the evidence shows that Walls was upset with Plaintiff for rescheduling the meeting that he had scheduled without his prior approval and for a period of time that was blocked out for vacation, not because she had a doctor's appointment. There is no inference of disability discrimination in this evidence. As for the second event, which involved Plaintiff's conduct during a meeting, although Plaintiff contends she was punished because she could not sit in a chair and did not feel good, the record is devoid of any evidence that Walls was aware that Plaintiff's medical

---

[25]There is no evidence of Plaintiff having a "disability" prior to that time.

condition was the reason she did not sit down or enter the room, or that Plaintiff felt bad on that

occasion. There is certainly no evidence that Plaintiff told anyone this was the case. With regard to

the staff bowling event, Plaintiff voiced no objection to this event, and although assuming Plaintiff's

contention to be true for purposes of summary judgment she would not have been able to actually

bowl due to a medical condition, there is no evidence that Plaintiff otherwise would not have be able

to attend this event with everyone else. To the contrary, Plaintiff herself concedes that she told Walls

that she was okay with the scheduling of and attending the event, although she subsequently testified

that she did so because she was reluctant to say otherwise. Plaintiff's Deposition, pp. 315-316.

When Plaintiff's attorney then wrote a notice letter to Life Cycle the following day, there was no

reference to this event, or indeed any indication as to what type of discrimination was being alleged.

Rather, her attorney simply stated,

> Please be advised that I represent the [Plaintiff] who was subjected to an illegal
> employment action on the job. Kindly forward this letter to your insurance carrier and
> request they contact me immediately. . . .

See Plaintiff's Memorandum in Opposition to Summary Judgment, Exhibit A.

The undersigned can discern no inference from this evidence sufficient to give rise to

a genuine issue of fact as to whether Plaintiff's discharge was the result of discrimination against her

because of a disability, nor is there evidence that her discharge occurred under circumstances that

raise a reasonable inference of unlawful disability discrimination. Reynolds, 701 F.3d at 150. While

Plaintiff forcibly argues that neither the culminating events leading to her termination, nor any of the

other performance problems cited in the record, justified her dismissal, this belief, no matter how

sincere or heartfelt, is simply not sufficient absent supporting evidence to survive summary judgment.

Cf. Sullivan v. River Valley School District, 197 F.3d 804, 815 (6th Cir. 1999) ["Without a showing



32

that those other reasons were discriminatory, [Plaintiff] cannot establish a prima facie case for relief under the ADA....], cert. denied, 530 U.S. 1262 (2000); Kariotis, 131 F.3d at 680 ["Discrimination statutes allow employers to discharge employees for almost any reason whatsoever (even a mistaken but honest belief) as long as the reason is not illegal discrimination. Thus when an employee is discharged because of an employer's honest mistake, federal anti-discrimination laws offer no protection."]; see also Boden v. U.S. Amada Ltd., 978 F.Supp. 657, 659 (E.D.N.C. 1997) [former employee's own belief and conclusory statements that he had been discriminated against based on a disability not sufficient to raise reasonable inference of unlawful discrimination]. Smith v. Flax, 618 F.2d 1062, 1067 (4th Cir. 1980)[Plaintiff's own perception is not relevant]; Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985)[A party opposing summary judgment "cannot create a genuine issue of fact through mere speculation or the building of one inference upon another"]; Buie v. Quad/Graphics, Inc., 366 F.3d 496, 507-508 (7th Cir. 2004)[Finding that, given Plaintiff's myriad of problems at work, a reasonable jury could not conclude from timing alone that Plaintiff was fired because of his announcement that he had AIDS]; cf. Palermo v. Clinton, No. 11-1958, 2012 WL 169125 at * 2 (7th Cir. Jan. 20, 2012)[Suspicious timing alone generally not enough to create a triable issue retaliation case].

Therefore, the Defendant Life Cycle is entitled to summary judgment on Plaintiff's ADA discrimination claim.

**Retaliation Claim**. Plaintiff's claim of retaliation is asserted under § 503(a) of the ADA, 42 U.S.C. § 12203(a), which provides as follows:

> No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation,



33

proceeding, or hearing under this chapter.

Retaliation cases under the ADA are subject to the same requirements of proof as are applicable to Title VII disparate treatment claims. Ross , 759 F.2d at 365; see also Williams, 871 F.2d at 457. The employee is initially required to establish a prima facie case of retaliation by a preponderance of the evidence. Such a prima facie case consists of three elements: (1) the employee engaged in protected activity; (2) the employer took adverse employment action against the employee; and (3) a causal connection exists between the protected activity and the adverse action. Id.; Freilich, 313 F.3d at 216; Harmer, 831 F.Supp. at 1308. Once a prima facie case has been presented, the Defendant employer has the burden of producing a legitimate, non-discriminatory reason for its actions. If the employer can produce a legitimate, non-discriminatory reason for its actions, the employee must then demonstrate that the Defendant's proffered reason is pretextural. Ennis, 53 F.3d at 58; Harmer, 831 F.Supp. At 1308.

Although Plaintiff has not actually identified what her protected activity was for purposes of this cause of action, assuming that it is her attorney's letter stating that she had been discriminated against, that letter did not itself identify what type of discrimination Plaintiff was alleging; i.e., disability, FMLA, Sex, etc. Therefore, it is arguable that the Defendant did not even know that Plaintiff had engaged in protected activity under the ADA, which in and of itself would defeat Plaintiff's ADA retaliation claim. However, even giving Plaintiff the benefit of the doubt and finding (at least for purposes of summary judgment) that the Defendant *was* aware that she had engaged in protected activity under the ADA, and also meets the second and third prongs of her prima



34

facie case,[26] her ADA retaliation claim still fails. As previously discussed, the Defendant has shown

a legitimate, non-discriminatory reason for Plaintiff's termination, and Plaintiff has not shown that

"but-for" her engaging in protected activity, she would not have been fired.

The evidence before the Court, as previously discussed, shows that Plaintiff had

documented problems with her job performance for at least ten months prior to her termination.

Plaintiff herself acknowledges that Walls expressed displeasure and concern about her job

performance, and had been doing so for some time, and she has not shown that, but-for her attorney's

letter, she would not have been terminated. Jackson v. St. Joseph State Hosp., 840 F.2d 1387, 1391

(8th Cir. 1988)[Title VII does not insulate an employee from the consequences of inadequate work

performance]; Nichols v. Carolina County Bd. of Educ., 123 F.Supp.2d 320, 327 (D.Md.

2000)[Plaintiff's contention that supervisors subjected him to adverse employment actions "because

I am who I am" insufficient to establish [discriminatory] character to their disagreements and

misunderstandings]; see also, Plaintiff's Deposition, attached Exhibit 30. While Plaintiff disagrees

---

[26]It is undisputed that Plaintiff was terminated and meets the second prong. With respect to whether a "causal connection" exists between her protected activity and her discharge, under the facts presented here the close "temporal proximity" between Plaintiff's protected activity (assuming arguendo that she has shown any) and the adverse employment action may itself be sufficient, at least for purposes of summary judgment, to establish this third prong of Plaintiff's prima facie case. See Laing v. Federal Express Corp., 703 F.3d 713, 720 (4th Cir. 2013); Heady v. US Enrichment Corp., 146 Fed.Appx. 766, 770-771 (6th Cir. 2005) ["[T]emporal proximity is sufficient to meet the low burden required to establish a prima facie case of retaliation ...."]; see also Hunt-Golliday v. Metropolitan Water Reclamation District of Greater Chicago, 104 F.3d 1004, 1013 (7th Cir. 1997)[noting that "suspicious timing does constitute circumstantial . . . evidence to support a claim of discrimination"]; Gordon v. Southern Bells, Inc., 67 F.Supp.2d 966, 988 (S.D.Ind. 1999)["A short time span between protected activity and an adverse employment action may be sufficient to prove a causal connection between the two events. . . . A close temporal connection between the two events is generally enough to satisfy the third element of the prima facie case."]; Jones v. City of Elizabeth City, North Carolina, 840 F.Supp. 398, 403 (E.D.N.C. 1996), aff'd., 2 F.3d 1149 (4th Cir. 1993). See Texas Dep't of Community Affairs, 450 U.S. at 253 [the burden of establishing a prima facie case is not onerous]; but see, cf. Palermo, 2012 WL 169125, at * 2.



with the personnel action taken against her, in order to succeed on her retaliation claim, Plaintiff's evidence must show that the reason she was discharged was because she engaged in protected activity, not because the Defendant made a mistake, was incorrect in its findings concerning Plaintiff's employment, or even that her supervisor just did not like her. See discussion, supra. Therefore, Plaintiff's ADA retaliation claim in her second cause of action should be dismissed.

## IV.

### Retaliation in Violation of FLSA, ADEA and ADA

Although Plaintiff has asserted a separate Third Cause of Action in her Complaint for Retaliation under the ADA, ADEA, and FLSA, and the Defendant has moved for summary judgment on all of these claims, in her response memorandum Plaintiff does not list this ADA claim on the initial page of her memorandum or otherwise discuss it other than in the context of mentioning Life Cycle's treatment of employee Kenneth Culverson as evidence of pretext in her other ADA claim.[27] See Plaintiff's Memorandum in Opposition to Summary Judgment, pp. 19-20.

With regard to Plaintiff's ADEA and FLSA claims, Plaintiff listed them on the initial page of her memorandum, but did not respond to the Defendant's motion for summary judgment, or the arguments and supporting evidence cited therein, with respect to any of these three claims and

---

[27]Culverson was a contract employee with Management Analysis and Utilization, Inc. ("MAU"), and worked as an independent contractor with Life Cycle, through MAU, on a number of projects from 2009-2002. See Defendants' Exhibit 4 (Culverson Affidavit). Plaintiff testified that Life Cycle did not want to hire Culverson because of a perceived disability (Parkinson's) and because of his age. Plaintiff's Deposition, pp. 198, 200-201. However, Culverson attests that he never sought a job at Life Cycle. Culverson further attests that he has no problems with any form of disability, his health is good, and that no one at Life Cycle has ever made any comment to him suggesting that they believed he had any type of disability. Culverson Affidavit. Furthermore, when Plaintiff testified about her concern about Defendant's comment about not hiring him, she was referencing age, not any alleged disability. See Plaintiff's Deposition, p. 203.

allegations. Specifically, Plaintiff has failed to cite to any evidence to support, or to even address, her claim that she was retaliated against on the basis of protected activity under the ADA (other than as discussed in Part III herein, supra), the ADEA, or the FLSA. See Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001)["Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists"]. In any event, for the reasons previously discussed, Plaintiff has failed to show that "but-for" her alleged protected activity (whether considering her allegations under the ADEA, ADA, or the FLSA), she would not have been terminated. University of Texas Southwestern Medical Center, 2013 WL 3155234 at **13-16; Gross v. FBL Financial Servs, Inc., 557 U.S. 167, 176 (2009)[The ADEA requires proof that the prohibited criterion was the but-for cause of the prohibited conduct.]; Palmquist v. Shinseki, 689 F.3d 66, 76-77 (1st Cir. 2012)[ADA retaliation case requires but-for causation standard]; Andrews, 2013 WL 3324227 at * 13; Raspanti v. Four Amigos Travel, Inc., 266 Fed. Appx. 820, 823 (11th Cir. 2008)[FLSA].

As Plaintiff has failed to argue against or contest Defendant's grounds for dismissal of these claims in any way, the undersigned finds that the Defendant Life Cycle[28] is entitled to summary judgment on these claims. Smith v. City of North Charleston, 401 F.Supp.2d 530, 532-533 (D.S.C. 2005)["[T]he the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against the party who fails to make a showing

---

[28]The undersigned has already addressed the fact that the four natural Defendants would not be subject to suit under the ADA or ADEA. See discussion, supra. With respect to the FLSA, even if individual liability was appropriate; cf. see Lamonica v. Safe Hurricane Shutters, Inc., 711 F.3d 1299, 1310 (11th Cir. 2013)[Discussing when individual liability may be appropriate under the FLSA]; these Defendants would be entitled to dismissal of this claim for the same reasons(s) as the Defendant Life Cycle. See discussion, infra.

sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial"], quoting <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986); <u>Hooven-Lewis</u>, 249 F.3d at 265 ["Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists"]; <u>Celotex Corp.</u>, 477 U.S. at 322 [Summary judgment should be entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial"]; <u>Burns v. Air Liquide America, LP</u>, 515 F.Supp. 2d 748, 759, n. 9 (S.D.Tex. 2007)[Undefended claims regarded as abandoned]; <u>see also</u> <u>Eady v. Veolia Transp. Services, Inc.</u>, 609 F.Supp.2d 540, 560-561 (D.S.C. 2009)["The failure of a party to address an issue raised in summary judgment may be considered a waiver or abandonment of the relevant cause of action."]; <u>accord</u>, <u>Ferdinand-Davenport v. Children's Guild</u>, 742 F.Supp.2d 772, 777 (D.Md. 2010); <u>Jones v. Family Health Ctr., Inc.</u>, 323 F.Supp.2d 681, 690 (D.S.C. 2003)[Finding that plaintiff waived claims not addressed in her opposition memorandum, even though counsel advised the court that she had not intended to abandon those claims]; <u>Mentch v. Eastern Savings Bank, FSB</u>, 949 F.Supp. 1236, 1247 (D.Md. 1997).

**V.**

**<u>Family and Medical Leave Act</u>**

In her fourth cause of action, Plaintiff claims that all of the Defendants denied and interfered with benefits she was entitled to under the FMLA, and retaliated against her for exercising her rights under the FMLA. The Family and Medical Leave Act provides that covered employees are entitled to a total of twelve (12) work weeks of leave during any twelve (12) month period for family and health related matters, as well as a right to be restored to the position of employment held by the



38

employee when the leave commenced, or to an equivalent position. 29 U.S.C. §§ 2612, 2614. The

FMLA also protects employees from discrimination or retaliation for exercising their rights under that

statute. 29 U.S.C. § 2615(a)(1) and (2). Stated another way,

> [t]he FMLA creates two types of claims: (1) interference claims, in which an
> employee asserts that his employer denied or otherwise interfered with his substantive
> rights under the Act; and (2) retaliation claims, in which an employee asserts that his
> employer discriminated against him because he engaged in activity protected by the
> Act.

Carr v. Mike Reichenbach Ford Lincoln, Inc., No. 11-2240, 2013 WL 1282105 at *6 (D.S.C. Mar.

26, 2013)(quoting Gleaton v. Monumental Life Ins. Co., 719 F.Supp.2d 623, 633, n. 3 (D.S.C. 2010));

Sommer v. The Vanguard Group, 461 F.3d 397, 399 (3rd Cir. 2006).

Defendants do not dispute for purposes of summary judgment that Life Cycle meets

the criteria for being an "employer" under the Act, and that Plaintiff was a covered employee entitled

to FMLA leave. Life Cycle does contest, however, that it ever denied Plaintiff FMLA benefits to

which she was entitled, or otherwise interfered with her FMLA rights or retaliated against her for

exercising those rights.

**Interference Claim**

Plaintiff alleges in her Interference Claim that Life Cycle interfered with her rights

under the FMLA when it "demanded that [she] check in on no less than a weekly basis during her

FMLA leave" and that the requested periodic check in was also in violation of company's FMLA

policy, which itself would be a violation of the FMLA. See Plaintiff's Memorandum in Support of

Partial Summary Judgment, pp. 1-14.

"To establish unlawful interference with an entitlement to FMLA benefits, an

employee must show that: (1) [s]he was an eligible employee, (2) [her] employer was covered by the



Act, (3) [s]he was entitled to leave under the FMLA, (4) [s]he gave [her] employer adequate notice of [her] intention to take leave, and (5) the employer denied [her] FMLA benefits to which [s]he was entitled." Carr, 2013 WL 1282105 at * 7 (quoting King v. Blanchard Mach. Co., No. 10-3219, 2012 WL 4586177 at * 5 (D.S.C. Sept. 28, 2012)); Makowski v. Smithamundsen LLC, 662 F.3d 818, 825 (7th Cir. 2011); see Taylor v. Progress Energy, Inc., 493 F.3d 454, 457 (4th Cir. 2007)[Under the FMLA, an employee has a "right to take a certain amount of unpaid medical leave each year and the right to reinstatement following such leave."]. Furthermore, Plaintiff must show that the interference caused her prejudice. Downey v. Strain, 510 F.3d 534, 540 (5th Cir. 2007)["[T]he FMLA's remedial scheme . . . requires an employee to prove prejudice as a result of an employer's noncompliance."], (citing Ragsdale v. Wolverwine World Wide, Inc., 535 U.S. 81, 90 (2002); Anderson v. Discovery Communications, LLC, No. 11-2195, 2013 WL 1364345, at * 7 (4th Cir. Apr. 5, 2013)[In order to establish a FMLA interference claim, Plaintiff has to prove not only interference, but that the violation prejudiced her]; Croy v. Blue Ridge Bread, Inc., No. 12-00034, 2013 WL 3776802, at * 8 (W.D.Va. July 15, 2013)[Plaintiff must demonstrate that he was prejudiced in some way].

Defendant does not dispute that Plaintiff satisfies the first four elements of her FMLA interference claim. See Defendant's Response in Opposition to Summary Judgment, p. 3. Defendant also acknowledges that Plaintiff does not have to contend that she was denied any specific benefits under the FMLA, if she can establish the Defendants engaged in conduct which "chilled" her rights under the FMLA. See Defendant's Memorandum in Opposition to Summary Judgment, p. 3; see also Terwilliger v. Howard Memorial Hosp., 770 F.Supp.2d 980, 983-984 (W.D.Ark. 2011)[FMLA claim can be based on "chilling effect" of a defendant's actions and interference occurs when a defendant's actions deters an employee's exercise of FMLA rights].



40

Here, Plaintiff has submitted pages from Life Cycle's FMLA policy which states "[w]hile on medical leave, the employee must contact his/her supervisor or department head every 30 days . . . ."  See Plaintiff's Memorandum in Support of Summary Judgment, Exhibit 8. Plaintiff contends that this requirement is itself a violation of the FMLA, because it does not allow for consideration of individual circumstances. Plaintiff also argues that her employer violated the FMLA by requiring that she check in weekly and by requiring her to work while on leave, which created a "chilling effect" which concerned her and which she perceived as pressure to return to work as quickly as possible, and that this "chilling effect" entitles her to recovery under her FMLA. Defendants argue that Life Cycles's communications with Plaintiff during her leave did not create a "chilling effect" as required to establish her interference claim.  Both parties seek summary judgment on this claim.

A review of the evidence establishes that Plaintiff initially submitted a request for intermittent FMLA leave on August 9, 2010, which was approved on August 11, 2010. Plaintiff's Deposition, Exhibits 22 & 23.  On and after August 11, 2010, Plaintiff sent numerous emails to various Life Cycle employees as to when she would be coming in to work, with some indicating a certain time of a particular day that she anticipated coming in and others indicating that she would be out a day or so provided that she felt better.  See Defendants' Memorandum in Opposition to Summary Judgment, Exhibit 1, Numbers 015172 [Aug. 11]; 015309 [Aug. 16]; 015318 [Aug. 17]; 000115 & 015349 [Aug. 19]; 015346 [Aug. 20]; 000110 [Aug. 22]; 015344 [Aug. 23]; 015340 & 000119 [Aug. 25].  These emails do not establish (or even create a genuine issue of fact) that Plaintiff's employer was interfering with her rights to FMLA leave during this time period, as it is apparent that Plaintiff's medical situation was unclear on a daily basis even to her, and that she was



41

herself updating Life Cycle as to her status because she did not know for sure if she could return on any given day or not.[29]  Id.

On August 29, 2010, Plaintiff emailed Walls that she would be talking with her doctor the following week regarding her condition and that she would let him know of any updates.  See Defendants' Memorandum in Opposition to Summary Judgment, Exhibit 1, Number 000097 [Aug. 29].  She continued in this email to state: "[a]t this point I think it's just easier for both of us in regards to sending or responding to daily updates to assume I will be out until after my eye surgery (sometime after Sept 19th??) unless my neck/arm/shoulder improve.  I can send daily updates if you like though.  Just let me know your preference. . . . " Id.  On August 30, 2010, Plaintiff sent the same email again.  See Defendants' Memorandum in Opposition to Summary Judgment, Exhibit 1, Number 015336 [Aug. 30].  There is no indication in the record that Walls ever responded to this inquiry.  On that same date, Plaintiff sent another email to four recipients who apparently worked with and/or for Plaintiff with an update on her status and personal notes to them.  See Defendants' Memorandum in Opposition to Summary Judgment, Exhibit 1, Number 015357 [Aug. 30].  Then, on August 30 and 31, 2010, there is an exchange of emails between Brookshire and Plaintiff regarding a doctor's statement which could apparently assist Plaintiff in getting disability status and which would benefit her as far as being paid during this time period.  See Defendants' Memorandum in Opposition to

---

[29]Although Plaintiff's FMLA leave apparently was subsequently changed to full-time on August 19, 2010 [see Answer, ¶ 30], the emails on and shortly after that date still indicate Plaintiff's intent to return to work within a couple of days, if possible.  See Defendants' Memorandum in Opposition to Summary Judgment, Exhibit 1 Nos. 000115 & 015349 [Aug. 19]; 015346 [Aug. 20]; 000110 [Aug. 22]; 015344 [Aug. 23]; 015340 & 000119 [Aug. 25].  From the exchange of emails in the record, it appears that Plaintiff submitted a doctor's excuse later which may have retroactively changed this date to reflect it as the date she went on full-time FMLA leave.  See Defendants' Memorandum in Opposition to Summary Judgment, Exhibit 1.

*Summary Judgment*, Exhibit 1, Number 000066 [Aug. 30]. There is nothing in this evidence to show an interference by the Defendants with Plaintiff's FMLA leave rights.

The next email submitted is on September 13, 2010, where Plaintiff sent an email to Human Resources letting them know that she was doing pretty well after the surgery and that she appreciated all of the well wishes and the flowers. *See Defendants' Memorandum in Opposition to Summary Judgment*, Exhibit 1, Number 000031 [Sept. 13]. On September 13 and 15, 2010, Plaintiff and Brookshire exchanged emails again (with Walls being copied on two of them) about the doctor's note (which again was apparently being discussed to assist Plaintiff in getting into disability rather than FMLA status, apparently for her pay). *See Defendants' Memorandum in Opposition to Summary Judgment*, Exhibit 1, Numbers 000006 [Sept. 13] & 015360 [Sept. 14 & Sept. 15]. On September 17, 2010, Plaintiff emailed Walls that the doctor was moving ahead with her neck surgery and she should know the date the following week. *See Defendants' Memorandum in Opposition to Summary Judgment*, Exhibit 1, Number 000120 [Sept. 17]. In that same email, Plaintiff stated that her recovery period would likely be two to three weeks after surgery and that the doctor was giving her the impression that he also wanted to go ahead with surgery on her other eye. *Id.* Walls' Call/E-Mail Log also reflects on September 17, 2010, "[v]oice mail indicating out of work from doctor since 8/19." *See Plaintiff's Memorandum in Support of Summary Judgment*, Exhibit 4. On September 18, 2010, Plaintiff sent the same email to Walls again. *See Defendants' Memorandum in Opposition to Summary Judgment*, Exhibit 1, Number 015378 [Sept. 18]. Again, there is nothing in this evidence to show an interference by the Defendants with Plaintiff's FMLA leave rights.

However, as noted the record does show that Plaintiff had emailed Walls on August 29 and 30 stating that it might be easier for both of them if they assumed that she would be out until



43

sometime after September 19th, but stating, however, that if he preferred, she could continue to send daily updates. See Defendants' Memorandum in Opposition to Summary Judgment, Exhibit 1, Numbers 000097 [Aug. 29] and 015336 [Aug. 30]. On September 21, 2010, Walls responded in an email to Plaintiff as follows: "Thank you for the update; it will be helpful if we can stay in communications on a weekly basis regarding your status. Hope you get to feeling better. Take care," See Plaintiff's Memorandum in Support of Summary Judgment, Exhibit 3. Walls testified that "[Plaintiff] had left me just numerous voice messages, e-mails, and it got to the point where it was just too much. And so at one point I said, Lois, just keep us – keep me informed; let me know on a weekly basis. So it was an attempt to reduce the volume of communications that was occurring." Walls Deposition, p. 48.

On September 28, 2010, Walls' Call/Email Log reflects, "[e]mail indicating surgery 10/5: no additional eye information." See Plaintiff's Memorandum in Support of Summary Judgment, Exhibit 4. On October 5, 2010, Walls' Call/Email Log shows that Plaintiff's husband came by to pick up a check and communicated that her surgery had been postponed and that she would call Walls. Id. The following day, Walls noted in his log that he had left Plaintiff a message on her cell phone and also called her at home, stating that he "woke her up (pain killer) and [she] would call me later in afternoon. I communicated that I would be available until 4:00pm. Lois did not return call today." Id. Plaintiff left Walls a voice message the next day saying that she didn't know when the surgery would be. Id.

On October 12, 2010, Walls' Call/Email Log indicates that he talked to Plaintiff, requesting that she "send data to Nick so he can complete the Talent Acquisition dashboard and to Laura so she can work on entering Talent Band data to Cost Point. Lois said she would have these

44

to Nick and Laura, maybe tonight, no later than Wednesday. It is 3:00 pm Wednesday, and these have not been received from Lois." See Plaintiff's Memorandum in Support of Summary Judgment, Exhibit 4. On October 13, 2010, Walls' Log indicates, "[r]eceived email from Lois that she could not access LCE system; Jennifer Cox reset password." Id. After an update in Walls' Log from Plaintiff's husband on October 15, 2010 that Plaintiff's surgery went well, the next notation is on October 20, 2010, stating "[r]eceived requested data from Lois." Id. The next notation in the Walls' Call/Email Log is on November 8, 2010, when Plaintiff returned to work part-time. Id.

Plaintiff presents several separate arguments in support of her FMLA interference claim. With respect to Plaintiff's argument that the notification requirement in Life Cycle's FMLA policy is itself a violation of the FMLA (because it requires all individuals on FMLA leave to check in every thirty (30) days without consideration to individual circumstances), regardless of whether this notification requirement is a violation of the FMLA, it is undisputed that this policy was not applied to Plaintiff. In fact, Plaintiff's argument is that she was discriminated against because she was required to go *beyond* the requirements of this policy. See Plaintiff's Reply Memorandum in Support of its Motion for Summary Judgment, p. 9. Accordingly, as this policy was admittedly not applied to her, Plaintiff cannot show any prejudice to her as a result of this policy, and this aspect of her interference claim is therefore subject to dismissal. See Ragsdale, 535 U.S. at 90; Downey, 510 F.3d at 540; Anderson v. Discovery Communications, LLC, supra; Croy v. Blue Ridge Bread, Inc., supra.

Plaintiff also notes that although she had received a raise in October for the preceding two years, she did not receive a raise in October 2010, which was while she was on FMLA leave. However, there is no evidence that Plaintiff not receiving a raise at that time was in any way related

to her being on FMLA leave. Rather, the evidence already discussed, <u>supra</u>, shows that Plaintiff was already on notice that her employer did not consider her job performance to be acceptable. <u>Plaintiff's Deposition</u> pp. 246-247, 256-257, 260-261, 266; <u>Plaintiff's Deposition</u>, Exhibit 17 [000015] & Exhibit 18; <u>Walls Deposition</u>, pp. 76-77. Although Plaintiff tries to tie her August mid-year performance evaluation to her request for FMLA leave, the record clearly reflects that the performance issues documented in that evaluation had been discussed with Plaintiff prior to that time, with Plaintiff specifically being warned in June 2010 (prior to requesting FMLA leave) that if her performance did not improve, a written warning would follow. Further, this evaluation was scheduled to occur mid-year from her previous evaluation in February, 2010, which coincided with the timing of Plaintiff's FMLA leave. <u>Plaintiff's Deposition</u>, Exhibit 18. Plaintiff only speculates, and has presented no evidence to show, that her being denied a raise by her employer was in any way an attempt to interfere with her right to take FMLA leave. <u>House</u>, 824 F.Supp. at 485 [Plaintiff's conclusory allegations insufficient to maintain claim]. This claim is without merit.

Plaintiff also argues in her reply memorandum that she was not restored to the same position with the same authority when she returned from FMLA leave, citing her inability to reschedule the November 9, 2010 recruiting status meeting. However, there is no evidence that this was related to her leave in any sense other than that meetings had continued to be scheduled while she was out. Assuming for purposes of summary judgment that prior to her FMLA leave Plaintiff scheduled and led these meetings, as previously discussed, the November 9, 2010 meeting was scheduled by her boss, who had led these meetings while she was on leave. Hence, Plaintiff did not reschedule a meeting which she had originally scheduled - she rescheduled a meeting that had been set by her boss without obtaining his prior approval for a time which had been blocked "vacation"



on the schedule. <u>See</u> discussion, <u>supra</u>. This evidence does not support or create an inference that

Plaintiff's job authority was changed because she took FMLA leave, or that the circumstances

surrounding the scheduling of this meeting was an attempt by the Defendants to interfere with her

FMLA rights or to deny her FMLA rights to which she was entitled.

Plaintiff's remaining interference claim is that Life Cycle requiring her to check-in

weekly and perform certain tasks while on her FMLA leave interfered with and "chilled" her right

to be on FMLA leave. This reporting requirement and the issue of whether Life Cycle was requiring

Plaintiff to complete work tasks even while out on leave are sufficient to create a genuine issue of fact

as to whether Plaintiff's FMLA leave rights were interfered with to survive summary judgment. It

is undisputed that Walls told Plaintiff to report in weekly, and while Defendants argue that Plaintiff

was only being asked to pass necessary data along so other employees could perform work that had

to be done, Plaintiff testified that Walls asked her to get the information, that she received a phone

call from another employee about it being a problem that she had not responded, that she informed

the employee to tell Walls that she would have to perform work because otherwise the data would

be meaningless, that she never was contacted after that not to do the work, and that because of the

nature of the data, she performed the work. It is apparently undisputed that she did do this work and

sent it to the Defendants days after her eye surgery. <u>Plaintiff Deposition</u>, pp. 289, 291-295; Exhibit

21;  <u>See</u> <u>Plaintiff's Memorandum in Support of Summary Judgment</u>, Exhibit 4.

Considered in the light most favorable to the Plaintiff, this evidence is sufficient to

create a genuine issue of fact as to whether Life Cycle requiring Plaintiff to check in weekly during

her FMLA leave and perform work tasks while on leave interfered with her FMLA leave rights to

survive summary judgment. <u>Terwilliger</u>, 770 F.Supp.2d at 983-984; <u>Franks v. Indian Rivers Mental</u>



Health Center, No. 08-1035, 2012 WL 4736444 at **16-17 (N.D.Ala. Sept. 30, 2012)[requiring employee to perform work while on FMLA leave can constitute interference under FMLA]; Kesler v. Barris, Sott, Denn & Driker, PLLC, No. 04-40235, 2008 WL 1766667 at * 4 (E.D.Mich. Apr. 17, 2008)[Employer's questions and requests for employee to do work while on FMLA leave were sufficient to constitute FMLA interference claim]. Therefore, neither Plaintiff or Life Cycle is entitled to summary judgment on this claim.

Finally, whether there is individual liability under the FMLA is an open question in the Fourth Circuit. Jones v. Sternheimer, 387 Fed.Appx. 366, 368 (4th Cir. 2010). District courts in this circuit have reached differing opinions, albeit primarily in the context of whether there is individual liability under the FMLA in the public sector.  Reed v. Maryland, Dep't of Human Resources, No. 12-472, 2013 WL 489985 (D.Md. Feb. 7, 2013)[Finding that the FMLA provides for individual liability under 29 U.S.C. § 2611(4)(A)(ii)(I) in the private sector]. However, individual liability in the private sector has been found in other Circuits. Mitchell v. Chapman, 343 F.3d 811, 827 (6th Cir. 2003)[Finding corporate officers acting in the interest of the corporation could be individually liable for FMLA violations]; Darby v. Bratch, 287 F.3d 673, 681 (8th Cir. 2002)[finding individual liability under FMLA]; see also Benton v. Belk, Inc., No. 12-766, 2012 WL 5381209 at **2-3 (D.S.C. Sept. 20, 2012)[Addressing individual liability under FMLA], adopted by, 2012 WL 5381335 (D.S.C. Oct. 31, 2012).

Here, the Defendants have not moved to dismiss Walls as a Defendant under Plaintiff's FMLA claim on the basis that there is no individual liability under the FMLA. Accordingly, based on the evidence in the record of his position with the company, his ability to not only supervise Plaintiff but to at a minimum recommend and participate in her termination, and the

specific alleged actions regarding her interference claim as relates to this Defendant, the undersigned does not find that he should be dismissed as a party Defendant with respect to this claim. Therefore, Defendant Life Cycle and Defendant Walls' motion for summary judgment with regard to Plaintiff's FMLA interference claim relating to having to "check in" weekly and perform work while out on leave should be denied. Muhammad v. Klotz, 36 F.Supp.2d 240, 243 (E.D.Pa. 1999) ["Thus, at the summary judgment stage the only inquiry is the threshold one of determining whether there is a need for a trial, that is, 'whether the evidence presents a sufficient disagreement to require submission to [the jury] or whether it is so one-sided that one party must prevail as a matter of law'"], citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-252 (1986).

However, with regard to the remaining individual Defendants Robert Fei, James Fei, and Schwartz, Plaintiff has presented no evidence or even allegations relating to these three (3) Defendants concerning this cause of action, or that they were even aware that any of the events alleged even took place. These remaining individual Defendants' motion for summary judgment should therefore be granted on this claim.

### (FMLA retaliation claim)

The FMLA guarantees Plaintiff the right not to be discriminated or retaliated against for exercising her substantive FMLA rights. 29 U.S.C. §§ 2615(a)(2), 2615(b); Taylor, 493 F.3d at 457. In the second part of her FMLA claim, Plaintiff alleges that the Defendant retaliated against her for taking FMLA leave by giving her a negative performance evaluation on August 13, 2010, three days after she applied FMLA leave, and by terminating her shortly after she returned from protected FMLA leave. See Plaintiff's Memorandum in Opposition, pp. 22-23.

A retaliation claim under the FMLA is analyzed under the same standards as are



49

applied to a Title VII retaliation claim. See Laing, 703 F.3d at 718-719; Dodgens v. Kent Mfg. Co.,

955 F.Supp. 560, 565-566 (D.S.C. 1997) [appropriate analysis for retaliatory discharge under FMLA

is that provided for Title VII for retaliatory discharge].  As previously discussed, pursuant to this

standard, "[t]he employee is initially required to establish a prima facie case of retaliation by a

preponderance of the evidence.  Such a prima facie case consists of three elements:  (1) the employee

engaged in protected activity; (2) the employer took adverse employment action against the employee;

and (3) a causal connection existed between the protected activity and the adverse action." Williams,

871 F.2d at 457; Munday, 126 F.3d at 242; Blankenship v. Buchanan General Hosp., 140 F.Supp.2d

668, 674 (W.D.Va. 2001).  Once a prima facie case has been presented, the Defendant employer has

the burden of producing a legitimate, non-discriminatory reason for its actions.  If the employer can

produce a legitimate, non-discriminatory reason for its actions, the employee must demonstrate that

the Defendant's proffered reason is pretextural. Id. ; Nichols v. Ashland Hosp. Corp., 251 F.3d 496,

502 (4th Cir. 2001).

It is undisputed that Plaintiff engaged in protected activity by exercising her rights

under the FMLA by taking leave.   It is also arguable that her attorney writing to the Defendant Life

Cycle was protected activity under the FMLA even though, as previously discussed, counsel did not

specify what discriminatory acts he was alleging.[30]  With respect to adverse action, the evidence

reflects that Plaintiff received a negative employee evaluation (referencing her purported performance

problems and advising her that if she did not immediately meet Life Cycle's expectations that she

could be terminated) on August 13, 2010, just a few days after having requested (and received)

---

[30]Due to the fact that Plaintiff was still on FMLA leave, it is a little more plausible that counsel's letter could be assumed to deal with FMLA claims.  However, it is not actually clear from the record exactly what kind of discrimination Plaintiff was alleging in that letter.



50

intermittent FMLA leave. Generally, having received a written warning about poor job performance is not, by itself, an adverse employment action for purposes of a retaliation claim. See generally, Lewis v. Forest Pharmaceuticals, Inc., 217 F.Supp.2d 638, 648 (D.Md. 2002) ["Reprimands, whether oral or written, do not *per se* significantly affect the terms or conditions of employment."] (citing Nye v. Roberts, 159 F.Supp.2d 207, 213 (D.Md. 2001) vacated and remanded on other grounds, 2002 WL 31163732 (4th Cir. 2002)); Williams v. Board of Educ. of Chicago, No. 07-6997, 2009 WL 140124 at * 4 (N.D.Ill. Jan. 21, 2009)["A negative performance evaluation, without more, does not rise to the level of an adverse employment action."]; Jackson v. City University of New York, No. 05-8712, 2006 WL 1751247 at * 4 (S.D.N.Y. June 26, 2006)[A negative evaluation without any effect on employment does not constitute a materially adverse employment action]; Naughton v. Sears, Roebuck & Co., No. 02-4761, 2003 WL 360085 at *5 n. 1 (N.D.Ill. 2003)[criticism, including a negative performance review or development plan, does not constitute an adverse employment action]. However, a negative evaluation that includes language regarding potential termination, followed by an actual termination, could possibly meet this prong. Cf. White v. Baxter Healthcare Corp., 533 F.3d 381, 402 (6th Cir. 2008)["In general, a negative performance evaluation does not constitute an adverse employment action unless the evaluation has an adverse impact on an employee's wages or salary . . . . thus, to characterize a negative performance evaluation as an adverse employment action the Plaintiff must point to a tangible employment action that she alleges she suffered, or is in jeopardy of suffering, because of the downgraded evaluation."] (internal citations omitted); Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 54 (2006)[explaining that the inquiry in a retaliation case is whether the alleged negative employment action "might have dissuaded a reasonable worker from making or supporting a charge of discrimination."]. In any event, it is not



51

disputed that Plaintiff's termination (and also not receiving a salary increase in October 2010) were adverse employment actions. Ainsworth, 851 F.Supp.2d at 976 ["Adverse employment actions are those that negatively impact the terms, conditions, or benefits of employment, . . . ., termination being the quintessential example . . . ."]; cf. White, 533 F.3d at 402 [Adverse inpact on employee's wages or salary can be adverse employment action]. Therefore, the first two (2) prongs of the retaliation prima facie case are met.

With respect to whether there is evidence of a causal connection between these events, the record reflects that Plaintiff's performance issues which were documented in the August 2010 evaluation had been documented prior to Plaintiff ever requesting FMLA leave. See discussion, supra. There is no evidence to show that Plaintiff's evaluation, which essentially detailed all of her previously documented and discussed performance problems, in any way related to her FMLA leave, other than the timing of the mid-term evaluation itself. However, the evidence shows that Plaintiff's annual evaluation had been on February 11, 2010, and her mid-year evaluation was done approximately six months later. Plaintiff's Deposition, Exhibit 17. Plaintiff has presented no evidence to show that her mid-year evaluation, which was discussed with her on August 13, 2010, was not scheduled for this time of year or otherwise had anything to do with her requesting FMLA leave. Plaintiff's Deposition, Exhibit 20.

With regard to not receiving a salary increase in October 2010, based upon the documented performance issues including a warning of termination, the evidence does not present a genuine issue of fact that the reason Plaintiff did not receive an increase in salary was because she was on FMLA leave. Nor does the evidence show Plaintiff's performance was at a level to entitle her to a raise. Bone v. G4S Youth Servs., LLC, 686 F.3d 948, 959 (8th Cir. 2012)[Fact that Plaintiff

took FMLA leave does not insulate an employee from termination for reasons unrelated to the taking of her FMLA leave].

With regard to her termination, this came approximately two weeks after Plaintiff's counsel wrote his letter to the Defendant and approximately a week after Plaintiff returned from intermittent FMLA leave. However, even assuming for purposes of further discussion of this claim that the close "temporal proximity" between Plaintiff's protected activity (the writing of the letter and/or return from FMLA leave) and her discharge is itself sufficient to establish this third prong of Plaintiff's prima facie case; see Heady, 146 Fed.Appx. at 770-771 ["[T]emporal proximity is sufficient to meet the low burden required to establish a prima facie case of retaliation in violation of the FMLA...."]; there is no evidence of pretext. As previously discussed herein, supra, the Defendant's evidence reflects that Plaintiff's termination was the result of a longstanding conflict between Plaintiff and her immediate supervisor, Walls, and that she was not performing her job satisfactorily. See discussion, supra.

> [T]he FMLA is not a strict-liability statute. Throneberry v. McGehee Desha County Hosp., 403 F.3d 972, 977 (8th Cir. 2005). An employee who requests FMLA leave has no greater protection against termination for reasons unrelated to the FMLA than she did before taking the leave. See id. . . . Therefore, an employer who "interferes with an employee's FMLA rights will not be liable if the employer can prove it would have made the same decision had the employee not exercised the employee's FMLA rights." Throneberry, 403 F.3d at 977; see also Bacon [v. Hennepin Cuonty Med. Ctr.], 550 F.3d [711,] 715 [(8th Cir. 2008)]; Phillips [v. Mathews], 547 F.3d [905,] 911-912 [(8th Cir. 2008)].

Estrada v. Cypress Semiconductor, Inc., 616 F.3d, 866, 871 (8th Cir. 2010).

As discussed in the previous retaliation claim sections, even considered in the light most favorable to the Plaintiff, Plaintiff has not shown that she would not have been terminated due to her previous documented performance problems "but-for" this alleged protected activity under the



FMLA. See discussion, supra. Rather, the evidence shows that Plaintiff was terminated for performance issues that were not related to her FMLA leave or her attorney's letter. Cf. Laing, 703 F.3d at 723 ["FMLA does not require an employee to be restored to his prior job after FMLA leave if he would have been discharged had he not taken leave."](quoting Yashenko v. Harrah's NC Casino Co., LLC, 446 F.3d 541, 549 (4th. 2006)); Bone, 686 F.3d at 959 [Fact that Plaintiff took FMLA leave does not insulate an employee from termination for reasons unrelated to the taking of her FMLA leave]; Jackson, 840 F.2d at 1391. Therefore, the Defendants' motion for summary judgment with regard to Plaintiff's FMLA retaliation claim should be granted.   University of Texas Southwestern Medical Center, 2013 WL 3155234 at **13-16; Andrews, 2013 WL 3324227 at * 13.

## VI.

### Breach of Contract and Implied Breach of Convenant of Good Faith and Fair Dealing[31]

Plaintiff alleges that the Defendants entered into a contract with her by promising that she would only be terminated for cause, to promote her to Walls' position when he retired, and thereafter breached her contract of employment by never placing her in that position and terminating her without cause. See Amended Complaint, ¶¶ 177-182. The Defendants argue in their motion for summary judgment, inter alia, that Plaintiff has failed to provide evidence sufficient to meet the elements of a contract to take her position outside of an at-will employment relationship.

With respect to employment, there is a presumption in South Carolina that employees are at-will; see Prescott v. Farmer's Tel. Co-Op., Inc., 516 S.E.2d 923, 927, n. 8 (S.C. 1999)[In South Carolina, "there is a presumption of at-will employment']; cf. Perrine v. G4S Solutions (USA), Inc.,

---

[31]Since Plaintiff combined her discussions and arguments pertaining to her claims for Breach of Contract (Sixth Cause of Action) and Breach of Covenant of Good Faith and Fair Dealing (Seventh Cause of Action), the undersigned has discussed this claims together.

54

No. 11-1210, 2011 WL 3563110, at * 2 (D.S.C. Aug. 9, 2011); Amason v. P. K. Management, LLC, No. 10-1752, 2011 WL 1100169, at * 6 (D.S.C. Mar. 23, 2011); and Plaintiff even admits that she was an at-will employee when she was hired. Plaintiff's Deposition, p. 82; see also Plaintiff's Memorandum in Opposition to Summary Judgment, p. 32. However, Plaintiff argues that she had an enforceable "contract" for employment, and was therefore not an at-will employee, based on an oral modification of the conditions of her employment and verbal assurances by the Defendant Walls that he would retire and she would replace him. Plaintiff's Brief, pp. 32-34.

It is true that at-will employment can be altered by an oral promise. Prescott, 516 S.E.2d at 926. However, "[t]o be binding an oral offer must be definite in its terms," and South Carolina courts are reluctant to transform vague assurances into binding and contractual promises. Walton v. Lockheed Martin Aircraft Center, No. 09-462, 2010 WL 3951524 at * 9 (S.C. Aug. 30, 2010), adopted by, 2010 WL 3951512 (D.S.C. Oct. 7, 2010), aff'd 407 Fed. Appx. 764 (4th Cir. Jan. 18, 2011). Plaintiff argues that her employment became "definite" and therefore contractually binding when Walls stated that he intended to tell the executive leadership team that he would be leaving and that Plaintiff would be taking over by December 31, 2008. However, even assuming this was Walls' intention, Plaintiff has presented no testamentary or documentary evidence to show that the necessary decision makers ever "definitely" approved her promotion. See Plaintiff's Deposition, pp. 91, R. Fei Deposition, p. 29. In any event, such a promotion by its very terms was not to have occurred except upon Walls' retirement, which never happened.

Further, even assuming that Plaintiff had evidence to show that her promotion had definitely been approved, albeit contingent on Walls' retiring, there is absolutely no evidence of any discussion of salary or any other terms relating to this employment. Hence, even assuming arguendo



55

that Plaintiff was promised a promotion in the event that Walls retired, there has been no showing

(or even any argument) that Plaintiff would have been anything more than an at-will employee in her

new position. Wadford v. Hartford Fire Ins. Co., No. 87-2872, 1988 WL 492127 at *5 (D.S.C. 1988)

["A review of the relevant authorities... reveals that a policy or representation must limit the duration

of employment or the employer's right to terminate employment in order to alter at-will status. Other

terms and conditions of employment, including pay, benefits, job duties, or location of performance

may be changed prospectively by either party without violating an employment contract with an

indefinite term."].

Although Plaintiff attempts to cure this deficiency by arguing that "it is well assumed

that the compensation would be what Walls' was at the time;" see Plaintiff's Brief, p. 35; that is all

she has - an assumption, and even an agreed upon salary (if such an agreement had been reached)

does not transfer a job from being at-will. Layton v. MMM Design Group, 32 Fed. Appx. 677, 680

(4th Cir. Apr. 2, 2002)[Finding an offer which included a salary figure remained "at will" because

did not otherwise state an employment term or indicate that the relationship could be terminated only

for cause]. Therefore, Plaintiff has failed to show evidence of a breach of contract. Presott, 516

S.E.2d at 926; Walton, 3010 WL 3951524 at * 9, adopted by 2010 WL 3951512.

Additionally, since Plaintiff has not shown that she had a contract, her claim for breach

of the implied covenant of good faith and fair dealing also fails. See Williams v. Riedman, 529

S.E.2d 28, 40 (S.C.Ct.App. Feb. 28, 2000)[Declining to apply this covenant to the employment at-

will situation where no contract exists.]; Keiger v. Citgo, Coastal Petroleum, Inc., 482 S.E.2d 792,

(S.C.Ct.App. 1997)[Affirming trial judge's dismissal of cause of action for breach of implied

covenant of good faith and fair dealing where employee failed to allege in her complaint that her at-



will employment status had been altered.]

Therefore, Defendants' motion for summary judgment should be granted as to these claims.[32]

## VIII.

### EPA Claim

In her Eighth Cause of Action, Plaintiff alleges that she was paid less than Greg Walls, her supervisor, in violation of the Equal Pay Act. The Equal Pay Act provides that

> (1) No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex....

29 U.S.C.§ 206(d)(1).

Under this statute and the applicable interpreting case law, in order to establish a prima facie case under the Equal Pay Act, Plaintiff must show that she received less pay than a male co-employee performing work substantially equal in skill, effort, and responsibility under similar working conditions. Wheatley v. Wicomico County, Md., 390 F.3d 328, 331 (4th Cir. 2004), cert. denied, 544 U.S. 1032 (2005); Houck v. Virginia Polytechnic Inst. & State Univ., 10 F.3d 204, 206 (4th Cir. 1993). If Plaintiff establishes her prima facie case, the burden shifts to the Defendant to

---

[32]With regard to the four natural Defendants who Plaintiff also sued on this cause of action in her Complaint, Plaintiff would face additional hurdles to establish liability against them individually for breach of contract and/or implied covenant of good faith and fair dealing. However, since these claims are being recommended for dismissal in toto and Defendants did not separately address those issues, the undersigned does not find it necessary to do so.

prove that the difference in salary is justified by one or more of the four statutory exceptions. 29

U.S.C. § 206(d)(1) (2002); Equal Employment Opportunity Comm'n v. Aetna Co., 616 F.2d 719, 724

(4th Cir. 1980)(quoting § 206(d)(1)). If the Defendant successfully meets this burden, then the

Plaintiff's claim fails "unless the plaintiff can satisfactorily rebut the defendant's evidence." Strag

v. Board of Trustees, 55 F.3d 943, 948 (4th Cir. 1995).

Here, Plaintiff's EPA claim fails because her only comparator is her supervisor/

manager. Plaintiff has not shown that she performed work substantially equal in skill, effort, and

responsibility under similar working conditions as her boss. See Plaintiff's Deposition, p. 96. Any

such claim is absurd on its face. Plaintiff's position was Manager of Organizational Development,

and she described her job duties to include: recruiting, getting positions organized for talent banding,

and improving internal communications. See Plaintiff's Memorandum in Opposition, p. 27; Walls'

30(b)(6) Deposition, p. 69. Walls' position was Senior Vice President of Human Resources, and

while his responsibilities included overseeing talent acquisition and recruiting, areas which were

similar to Plaintiff's responsibilities; Walls' Deposition, p. 10; Walls' 30(b)(6) Deposition, pp. 7-8;

Walls was also responsible for employee engagement, performance management, and compensation

and benefits, areas outside of Plaintiff's primary responsibilities. Walls' Deposition, p. 18-19; Walls'

30(b)(6) Deposition, p. 8. The record also clearly reflects that Walls was Plaintiff's supervisor, was

leader of the Human Resources Department, and a member of the executive Leadership Team.

Walls' Deposition, pp. 18-19; Walls' 30(B)(6) Deposition, p. 7. Therefore, the evidence does not

show that their jobs required equal skill, effort and responsibility. Ratts v. Business Systems, Inc.,

686 F.Supp. 546, 550 (D.S.C. 1987)[EPA claims must be based on substantially equal jobs requiring

the same skill, effort and responsibility].



Accordingly, Plaintiff has not shown that any male co-employee was receiving higher pay for substantially the same work. This claim is therefore subject to dismissal. Strag v. Board of Trustees, Craven Community College, 55 F.3d 943, 950 (4th Cir. 1995)[Granting summary judgment and finding Plaintiff "cannot rest on the bare allegation" that she was performing similar work, and failed to actually show that she was performing similar work as her alleged comparator].

## IX.

### Promissory Estoppel

In her ninth and final cause of action, Plaintiff alleges a promissory estoppel claim against all of the Defendants. In order to establish a claim for promissory estoppel, Plaintiff must establish the existence of: (1) a promise unambiguous in its terms; (2) the party to whom the promise is made reasonably relied on the promise; (3) the reliance was expected and foreseeable by the party who made the promise; and (4) the party to whom the promise is made sustained injury in reliance on the promise. Prescott v. Farmers Telephone Cooperative, Inc., 491 S.E.2d 698 (S.C.Ct.App. 1997), rev'd on other grounds by, 516 S.E.2d 923 (S.C. 1999); Anthony v. Atl. Group, Inc. Nos. 09-02383 & 09-2942, 2012 WL 5511914 at *20 (D.S.C. 2012).

Defendants contend that Plaintiff has not shown that the promise that she would succeed Walls was unambiguous in its terms. Plaintiff testified that Walls[33] said that he was not

---

[33]The Court notes that Plaintiff has failed to make any assertions with regard to Defendant Schwartz which could be construed as making any promise to the Plaintiff. With regard to Defendants Robert Fei and James Fei, the only testimony allegedly showing their knowledge of Plaintiff potentially taking over Walls' position if he retired, is Walls' testimony that he had spoken to them and they were "on board" with the plan. Plaintiff's Deposition, p. 91. Robert Fei testified that "part of looking for a high-caliber HR person was, one, because we wanted to expand the scope of services and value that our internal HR team provided to the organization, but ideally, we would grow an internal candidate to be a potential successor for Greg." Robert Fei Deposition, p. 29.

(continued...)



59

going to stay at Life Cycle for long and that he had informed two other individuals at Life Cycle of his plans to leave. <u>Plaintiff's Deposition</u>, p. 72. Plaintiff also testified that Walls told her that he had "a lot of influence" in the ability to make the transition happen; <u>Plaintiff's Deposition</u>, p. 91; and that at the time that she was hired, Walls gave her a one to two year time frame for his departure. <u>Plaintiff's Deposition</u>, p. 73. Additional conversations occurred in the fall of 2008, around October or November, when Walls indicated that his intention was to tell the executive leadership team that he would be leaving and Plaintiff would be taking over by December 31, 2008, and to make the announcement to the organization by the end of January 31, 2009. <u>Plaintiff's Deposition</u>, p. 91. However, around February or March 2009, Walls disclosed to Plaintiff that he was no longer planning on leaving Life Cycle because he could not afford to do so, and that Plaintiff would not be taking over his position. <u>Plaintiff's Deposition</u>, p. 93.

Plaintiff asserts that the promise that she would succeed Walls was not ambiguous because of the specific time frames given by Walls in October or November 2008 of Plaintiff taking over in December 2008. However, at the time of this discussion Plaintiff was already working for the Defendant as a concededly at-will employee, Plaintiff had had no discussions with the principles of the company or obtained a commitment from them that she would definitely be promoted to Walls' job when he retired (which, even then, would still have been an at-will position) or what her salary, <u>etc</u>. might be, and since Walls never retired, the position never even became available. The facts of

---

[33](...continued)

However, no evidence of any firm commitment that Plaintiff would receive this position has been shown, and in any event, as previously discussed, no salary was ever offered and Plaintiff only assumed that it would be the same as Walls, while the job itself was only even to become available if Walls retired. Therefore, Plaintiff has failed to show that a promise that Plaintiff would become head of HR unambiguous in its terms was ever made by Robert or James Fei. <u>See</u> discussion, <u>supra</u>.



this case are replete with ambiguity with respect to how/when/if Plaintiff would ever obtain Walls' job. Therefore, Plaintiff's claim for promissory estoppel fails.

## Conclusion

Based on the foregoing, it is recommended that Plaintiff's motion for partial summary judgment be **denied.** It is further recommended that the Defendants' motion for summary judgment be **granted** as to all of Plaintiff's claims, with the exception of Plaintiff's FMLA interference claim against Defendants Life Cycle and Walls, relating to Plaintiff having to call in weekly and perform work while out on FMLA leave.[34]

The parties are referred to the notice page attached hereto.

Bristow Marchant
United States Magistrate Judge

July 26, 2013
Charleston, South Carolina

---

[34]However, summary judgment should be granted to the Defendants with respect to all of Plaintiff's remaining FMLA interference claims.

61

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
Post Office Box 835
Charleston, South Carolina 29402

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

