**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | | |
|---|---|---|
| LOIS CHAUNCEY, | ) | |
| | ) | No. 2:12-cv-968-DCN |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | **ORDER** |
| LIFE CYCLE ENGINEERING, INC., | ) | |
| ROBERT F. FEI, II, JAMES R. FEI, | ) | |
| GREG WALLS, AND MICHAEL E. | ) | |
| SCHWARTZ | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

This matter is before the court on Magistrate Judge Bristow Marchant's Report and Recommendation ("R&R") that this court deny plaintiff Lois Chauncey's ("Chauncey") motion for partial summary judgment and grant defendants' motion for summary judgment, except as to plaintiff's FMLA interference claim against defendants Life Cycle Engineering, Inc. ("Life Cycle") and Greg Walls ("Walls"). Plaintiff and defendants each filed written objections to the R&R. For the reasons set forth below, the court accepts the R&R in part and rejects the R&R in part.

## I.  BACKGROUND

### A.     Procedural History

Chauncey filed this action asserting claims for gender discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), et seq.; discrimination and retaliation in violation of the Americans with Disabilities Act ("ADA"), as amended by the ADA Amendments of 2008 ("ADAAA"), 42 U.S.C. § 12101, et seq.; retaliation in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 215(a)(3), the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §

1

623, et seq., and the ADA[1]; interference with, and retaliation for, exercising her rights under the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 et seq.; breach of contract; breach of implied covenant of good faith and fair dealing; violation of the Equal Pay Act ("EPA"), 29 U.S.C. § 206(D), et seq.; and promissory estoppel.[2]

The defendants moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure on January 11, 2013.  Chauncey moved for partial summary judgment as to her FMLA interference claim on the same day.[3]  Chauncey and defendants opposed each other's motions on January 28, 2013.  Both plaintiff and defendants filed reply memoranda on February 7, 2013.  Defendants filed a supplemental memorandum on July 26, 2013.  The magistrate judge filed an R&R on July 29, 2013, recommending that plaintiff's motion for partial summary judgment be denied and that defendants' motion for summary judgment be granted as to all of plaintiff's claims, with the exception of the FMLA interference claim against Life Cycle and Walls relating to Chauncey having to call in weekly and perform work while out on FMLA leave.  ECF No. 31.  Defendants filed objections to the R&R on August 12, 2013, and Chauncey filed objections to the R&R on August 15, 2013.  Defendants filed a reply to Chauncey's objections on September 3, 2013.  Chauncey also moved to strike defendants' supplemental memorandum as untimely on July 29, 2013.  ECF No. 32.  These matters are now ripe for the court's review.

---

[1] This is a separate claim based on different facts than the ADA retaliation claim set forth in Chauncey's second cause of action.
[2] Chauncey originally also asserted a defamation claim against Life Cycle and Walls, though she has since conceded that claim.  Pl.'s Opp'n to Summ. J. 35.
[3] Plaintiff also asserts an FMLA retaliation claim that is not the subject of her partial motion for summary judgment.

B.    **Factual Allegations**[4]

Chauncey initially interviewed with defendant Greg Walls, Life Cycle's vice president for human resources, in May 2008 for a position at Life Cycle as an organizational development specialist in the human resources department.  Pl's Dep. 63:2-64:10, Dec. 14, 2012.  During the interview, Walls indicated that he was not planning to stay at Life Cycle much longer and was looking for someone to take over his position when he left, which Chauncey got the impression would be in a year or two. Pl.'s Dep. 63:25-64:10, 73:11-21, 88:6-15.  Walls told Chauncey that, while he did not have the final say on who would replace him when he retired, he did have a lot of influence. [5]  Pl.'s Dep. 77:17-22, 90:23-91:4.  Shortly thereafter, Chauncey was hired as a senior organizational specialist with an annual salary of $90,000.  Pl.'s Dep. 62, 69; Pl.'s Dep. Ex. 1.

Chauncey began working for Life Cycle on July 7, 2008.  Pl.'s Dep. Ex. 2.  In January 2009, Chauncey was given a raise to $120,000 per year and her job title was changed to organization development manager.  Pl.'s Dep. 97:25-98:11; Pl.'s Dep. Ex. 4. In July 2009, in response to an email asking Chauncey to contact two individuals about the status of a pending project, Chauncey sent an email, copying Walls, stating that she was at the hospital with her daughter-in-law who was in labor and that she would contact the individuals later.  Pl.'s Dep. Ex. 9.  Walls' response to Chauncey indicated that he did not realize this individual was Chauncey's daughter-in-law.  Id.  In fact, the individual in question was not Chauncey's daughter-in-law, but rather the wife of a Citadel cadet who

---

[4] The facts and evidence are considered and discussed in the light most favorable to the party opposing each motion for summary judgment, respectively.  Pittman v. Nelms, 87 F.3d 116, 118 (4th Cir. 1996).
[5] Although Walls made repeated references to this plan, by May 2009 he had made it clear that he could not afford to retire due to the economy, and instead he would remain at Life Cycle.  Pl.'s Dep. 102:13-17.

3

Chauncey hosted and considered a "son."  Id.  Walls was concerned that Chauncey had

been "less than honest" about the situation.  Walls 30(b)(6) Dep. 72:7-12. [6]

      In October 2009, Walls tried to discuss with Chauncey some negative feedback he

had received regarding the company's performance review initiative and recruiting

process.  Pl.'s Dep. 206:6-23; Walls 30(b)(6) Dep. 9-14.  There were concerns regarding

inadequate training and overloading the organization, and Walls wanted to provide

Chauncey with feedback before she rolled out another change with respect to

performance management.  Walls 30(b)(6) Dep. 73:7-10, 74:9-14.  Chauncey told Walls

that she was sick and walked out of the meeting, stating that she would like to talk about

it later.  Pl.'s Dep. 206:24-25, 209:1-14.  Walls claimed that Chauncey refused to accept

feedback and was "rude[]" and "disrespectful[]" in leaving the meeting early.  Walls

30(b)(6) Dep. 74:16-18.  Walls also felt there was friction in the human resources office,

particularly between himself and Chauncey, and that everyone in the department needed

to "work on it together."  Pl.'s Dep. 213:1-16, 217:1-9.  Nonetheless, Chauncey received

a $10,000 bonus in October 2009 and a pay raise to $125,000 at the end of 2009.  Pl.'s

Dep. 226:14-23.  Robert F. Fei, II ("Bob Fei"), president of Life Cycle, provided a

positive reference for Chauncey's application for an advanced degree at Northeastern

College in November 2009, and Walls was also supportive.  Pl.'s Dep. 136:14-137:19.

      In December 2009, Chauncey responded to an anonymous employee survey by

commenting that she was working 80-90 hours per week, that she was concerned about

the workload, that the workload was not evenly distributed, and that the amount of work

hours was impacting her physical health.  Pl.'s Dep. 236:16-237:15.  On January 8, 2010,

---

[6] In addition to the submission of Walls' individual deposition excerpts, the parties have also submitted
excerpts from his separate deposition as Life Cycle's 30(b)(6) representative.

Walls called Chauncey in for a meeting with himself and defendant Michael Schwartz, chief financial officer of Life Cycle.  Pl.'s Dep. 230:11-13.  At the meeting, Walls told Chauncey that it was clear that she had a problem working for him, offered to help her leave the company, and told her that he could probably assist her in getting a severance package.  Pl.'s Dep. 230:18-20.  Chauncey thought that Walls was acting in retaliation for her comments on the anonymous employee survey.  Pl.'s Dep. 234:9-15.  During the same meeting, Walls communicated his belief that Chauncey had been defensive when he had tried to talk with her about negative feedback in October 2009, and also shared his concerns about a performance management communication that went out in December 2009 and a confrontation that had occurred between Chauncey and another employee in November 2009.  Pl.'s Dep. 246:12-247:11.  Chauncey understood that Walls was not happy with her performance, and she blamed the unhappiness on assumptions he was making about her, her survey responses, and the fact that she was pushing back on some "illegal" practices.  Pl.'s Dep. 247:12-20.

Also on January 8, 2010, Chauncey met with James R. Fei ("Jim Fei"), chief executive officer of Life Cycle, who felt that she had a problem working with Walls and that she was upset she did not get Walls' job when he decided not to retire.  Pl.'s Dep. 260:21-261:13.  At the end of the meeting, Jim Fei expressed a need for Chauncey and Walls to try harder to work through their some of their differences.  Pl.'s Dep. 263:17-23.

Thereafter, Chauncey and Walls went to lunch to clear the air about some of the things that were bothering them.  Pl.'s Dep. 264:10-19.  Later, they developed a plan known as the "Relationship Guiding Principles" and decided to have weekly one-on-one meetings where they would go over the principles.  Pl.'s Dep. 266:6-12; Pl.'s Dep. Ex.

16.  Chauncey often felt intimidated and patronized during these meetings.  Pl.'s Dep. 266:19-267:5.   Chauncey reported her feelings of intimidation to Bob Fei on multiple occasions.  Pl.'s Dep. 267:18-24.

In February 2010, Chauncey received a "2," indicating "not meeting expectations," in interpersonal relationships on her annual performance review, with Walls observing "[o]pportunity to improve here, especially with relationships on the CSG leadership team.  Encourage you to listen and accept feedback when others approach you [versus] becoming defensive, deflecting feedback."  Pl.'s Dep. Ex. 17.  Despite this, the review was "satisfactory overall."  Pl.'s Dep. 271:3-272:3; Pl.'s Dep. Ex. 17.  On June 2, 2010, Chauncey was issued a performance improvement template with several areas of concern outlined, specifically presentations by Chauncey that were not well done, resulting in Wells "losing confidence" in Chauncey.  Pl.'s Dep. Ex. 18.

On August 9, 2010, Chauncey submitted a request for intermittent FMLA leave for cervical stenosis, a serious medical condition, which was approved on August 11, 2010.  Pl.'s Dep. Exs. 22, 23; Answer ¶ 27.  On or about August 11, 2010, Chauncey went on full, as opposed to intermittent, leave under the FMLA.  Answer ¶ 30.  After going on full-time leave, Chauncey sent Walls ten emails updating her status.  Defs.' Opp'n Ex. 1.  On September 21, 2010, Walls responded to an email from Chauncey stating "[t]hank you for the update; it will be helpful if we can stay in communications on a weekly basis regarding your status.  Hope you get to feeling better."  Pl.'s Mem. in Supp. of Partial Summ. J. Ex. 3.  On September 28, 2010, Walls sent an email to Chauncey asking her where he could find certain information so that others could work with that information while she was on leave.  Pl.'s Dep. Ex. 21.  In making this request,

6

Walls specifically indicated that "there is no expectation for you to update or do work, just send what you have or point folks to where the files are." Id. On October 6, 2010, Walls, after leaving a message on Chauncey's cell phone, called Chauncey at home, noting in his call log that he had woken her up from pain killers. Pl.'s Supp. Ex. 4. On October 12, 2010, Walls again talked to Chauncey on the phone, checking on her condition and requesting again that she send two co-workers information. Id.

On August 13, 2010, four days after Chauncey submitted her request for FMLA leave, Walls shared with Chauncey her mid-year performance review. Pl.'s Dep. 286:1-9; Pl.'s Dep. Ex. 20. Walls told Chauncey that he did not like how she was treating him, Pl.'s Dep. 287:19-20, and rated her as "not meet[ing] expectations" in her relationships with other employees and being a team advocate. Pl.'s Dep. Ex. 20. Walls also commented on Chauncey's "insistence that things go your way and . . . refusal to accept feedback and take responsibility" and noted a "lack of trust" between her and other employees, which resulted in "teammates questioning [her] intentions." Id. Walls noted that these deficiencies "have been discussed with you on a number of occasions with little or no improvement," and that if Chauncey did not immediately meet expectations, there would be "no other alternative but to terminate [her] employment." Id. Walls rated Chauncey as "generally not meeting expectations" overall. Id.

On or about October 1, 2010, Life Cycle's annual salary increases went into effect and Chauncey did not receive an annual salary increase for the first time since her employment with Life Cycle. Answer ¶¶ 33-34. Defendants contend that Chauncey's salary was the highest among her peers in the Corporate Services Group and that she did

not receive an increase because she was on notice that her performance was not acceptable.  Answer ¶ 34.

Chauncey returned from FMLA leave on November 8, 2010.  Pl.'s Dep. 307:18-19.  While Chauncey had been on leave, Walls sent out an email reminding other employees of a recruiting team meeting scheduled for November 9, 2010.  Pl.'s Dep. Ex. 29.  Walls forwarded this email to Chauncey.  Id.  Chauncey changed the meeting to the next day, November 10, without getting Walls' approval because she had a doctor's appointment at the time the meeting was originally scheduled.  Pl.'s Dep. 310:3-10, 312:17-23.  It was Chauncey's duty to schedule these meetings and she had previously rescheduled such meetings for various reasons.  Pl.'s Dep. 310:3-4, 312:11-14.  An email from Chauncey to Walls acknowledged that the time she rescheduled the meeting for had been "blocked out" by Walls for vacation, but she said, "I think you'll be here."  Pl.'s Dep. Ex. 29.  However, Chauncey testified in her deposition that the schedule did not show a conflict.  Pl.'s Dep. 313:12-10.  When Chauncey saw Walls in the hallway shortly after she rescheduled the meeting, she verbally informed him of her actions, the reason, and that she would be happy to reschedule again if that did not work for his schedule.  Pl.'s Dep. 312:20-313:3.  At that time, Walls did not express that he was upset she had rescheduled the meeting.  Pl.'s Dep. 313:4-8.

Walls met with Chauncey on November 10, 2010 and expressed concern over the fact that she had changed the meeting without checking with him.  Pl.'s Dep. 308:12-309:4.  Chauncey told him that she had always changed meeting times in the past when there were conflicts.  Pl.'s Dep. 309:19-21.  Walls also reminded her that the conditions stated in her mid-year performance review were still in place.  Pl.'s Dep. 308:16-20, Ex.

28.  Walls emphasized in this meeting that "[i]mmediate and lasting improvement is expected in your performance; specifically in relationships and being a team player." Pl.'s Dep. Ex. 28.

On November 16, 2010, a weekly human resources meeting was held.  Pl.'s Dep. 314:16-17.  At this meeting, Chauncey testified that she stood in the doorway and did not sit down because her neck was hurting and it helped ease her pain to hold her neck against the wall.  Pl.'s Dep. 314:4-13.  She also testified that a chair was not available. Pl.'s Dep. 314:6.  Walls was not happy that Chauncey did not come into the meeting room and participate in a meaningful way, even when he directed a question to her and attempted to engage her in the conversation.  Walls Dep. 34:12-19.  During the meeting, a proposed team bowling event was discussed.  When Walls asked Chauncey if she was okay with the bowling party, she responded that she was.  Pl.'s Dep. 315:25-316:2. However, she testified that she had previously informed Walls that she was not permitted to lift anything larger than a milk jug due to a medical condition.  Pl.'s Dep. 315:11-13. Chauncey was concerned that she would not be able to participate in bowling.  Pl.'s Dep. 315:21-23.

Thereafter, Chauncey retained legal representation.  Pl.'s Mem. in Opp'n to Defs.' Mot. for Summ. J. 9.  In a letter dated November 17, 2010, Chauncey's attorney informed Walls that he was representing Chauncey with regard to illegal employment action, although the letter did not specify what type of illegal employment action had purportedly occurred.  Pl.'s Opp'n Ex. A.  Chauncey returned to work full-time from FMLA leave without restrictions on November 22, 2010.  Pl.'s Opp'n 9.  On December 1, 2010, Walls and Schwartz called Chauncey in for a meeting where she was officially

terminated.  Pl.'s Dep. 313:20-24.  Walls told Chauncey that he wanted to go through a

list of events that precipitated her termination, Pl.'s Dep. 314:1-2, but Chauncey walked

out before Walls could finish the list.  Pl.'s Dep. 314:1-2, 317:1-318:1-10.

## II.   STANDARD OF REVIEW

This court is charged with conducting a de novo review of any portion of the

magistrate judge's R&R to which specific, written objections are made.  28 U.S.C. §

636(b)(1).  A party's failure to object is accepted as agreement with the conclusions of

the magistrate judge.  See Thomas v. Arn, 474 U.S. 140, 149-50 (1985).  In absence of a

timely filed objection to a magistrate judge's R&R, this court need not conduct a de novo

review, but instead must "only satisfy itself that there is no clear error on the face of the

record in order to accept the recommendation."  Diamond v. Colonial Life & Acc. Ins.

Co., 416 F.3d 310, 315 (4th Cir. 2005) (citing Fed. R. Civ. P. 72 advisory committee's

note).  The recommendation of the magistrate judge carries no presumptive weight, and

the responsibility to make a final determination rests with this court.  Mathews v. Weber,

423 U.S. 261, 270-71 (1976).  This court may accept, reject, or modify the report of the

magistrate judge, in whole or in part, or may recommit the matter to him with instructions

for further consideration.  28 U.S.C. § 636(b)(1).

Summary judgment is proper "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a).  "Only disputes over facts that might affect the outcome of the suit

under the governing law will properly preclude the entry of summary judgment."

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "[S]ummary judgment will

not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that

a reasonable jury could return a verdict for the nonmoving party." Id.  At the summary judgment stage, the court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in his favor.  Id. at 255.

### III.  DISCUSSION

Chauncey objects to the R&R on five grounds:  (1) the magistrate judge erred in concluding that defendants' refusal to follow its FMLA leave policy did not interfere with Chauncey's FMLA rights; (2) the magistrate judge erred in determining that the defendants issuing their first negative performance review two days after Chauncey started FMLA leave was not sufficient to create a genuine dispute that defendants interfered with her FMLA rights; (3) the magistrate judge erred in concluding that Chauncey's work authority and job duties were not diminished immediately upon her return to work from FMLA leave; (4) the magistrate judge erred in concluding that the FMLA retaliation cause of action should not proceed because there was no evidence of pretext; and (5) the magistrate judge erred in concluding that there was no genuine dispute of fact as to whether plaintiff's discharge was the result of discrimination because of a disability.  Pl.'s Objections 2-3.

Defendants object to the R&R on two grounds:  (1) the magistrate judge erred in concluding that there is sufficient evidence to create a genuine issue of fact as to whether Life Cycle requiring Chauncey to check in weekly while on leave interfered with her FMLA leave rights; and (2) the magistrate judge erred in concluding that there is sufficient evidence to create a genuine issue of fact as to whether Life Cycle requiring Chauncey to perform work tasks while on leave interfered with her FMLA leave rights. Defs.' Objections 1.

As an initial matter, all of Chauncey's objections relate to her FMLA and ADA causes of action.  None of her objections are directed to the recommended dismissal of her claims under Title VII, the FSLA, the ADEA, breach of contract, breach of the duty of good faith and fair dealing, or promissory estoppel.  With respect to her claims under the ADA, Chauncey does not object to either the recommended dismissal of her ADA retaliation claim or the recommended dismissal of the individual defendants from her ADA claim.  Because Chauncey has not objected to the R&R on these issues, the court need not conduct <u>de novo</u> review, but must "only satisfy itself that there is no clear error on the face of the record in order to accept the magistrate judge's recommendation." <u>Diamond</u>, 416 F.3d at 315.  The court finds no clear error on the face of the record.

Therefore, the court adopts the R&R and grants defendants' motion for summary judgment as to the following claims: (1) gender discrimination and retaliation under Title VII; (2) discrimination on the basis of disability under the ADA, with respect to the individual defendants; (3) retaliation on the basis of disability under the ADA; (4) retaliation in violation of the FLSA and ADEA; (5) breach of contract; (6) breach of the implied covenant of good faith and fair dealing; (7) violation of the EPA; and (8) promissory estoppel.

The court now considers Chauncey's remaining claims, which are the subject of the parties' objections.

### A.    ADA Discrimination Claim

Chauncey argues that the magistrate judge erred in concluding that the cause of action for violation of the ADA should be dismissed because he could "discern no inference from [the] evidence sufficient to give rise to a genuine issue of fact as to

whether Plaintiff's discharge was the result of discrimination because of disability." Pl.'s Objections to R&R 3.

The ADA prohibits discrimination by a covered entity, including a private employer, against any "qualified individual on the basis of disability" in regard to any term or condition of employment. 42 U.S.C. § 12112(a). To maintain a claim under the ADA, a plaintiff must present evidence to show that (1) she is a "qualified" person with a disability under the ADA, and (2) the defendant is a "covered entity" subject to suit under that statute. 42 U.S.C. § 12112(a); see Pollard v. High's of Balt., Inc., 281 F.3d 462, 467 (4th Cir. 2002). For purposes of summary judgment, Life Cycle does not dispute that Chauncey is a "qualified individual" with a disability[7] or that it is subject to suit under the ADA. Chauncey brings two separate discrimination claims under the ADA: (1) a claim for wrongful discharge, and (2) a claim for failure to accommodate.

### 1.      Wrongful Discharge

In general, there are "two avenues" by which a plaintiff may prove wrongful discharge based on discrimination. See Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 285 (4th Cir. 2004) (en banc). The first is to offer "direct or indirect evidence" of discrimination, under "ordinary principles of proof." Burns v. AAF–McQuay, Inc., 96 F.3d 728, 731 (4th Cir.1996) (internal quotations omitted). The second avenue available is to follow the burden-shifting approach first articulated by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Halperin v.

---

[7] The term "disability" is defined as a physical or mental impairment that substantially limits one or more major life activities of an individual, a record of such an impairment, or being regarded as having such an impairment. 42 U.S.C. § 12102(1). "Major life activities" include, but are not limited to, activities such as caring for oneself, seeing, hearing, walking, standing, communicating, and working. 42 U.S.C. § 12102(2). Plaintiff alleges that she has a "disabilities" which include intracranial hypertension, pseudo turmor cerebri, and spinal stenosis with disc compression and herniation. Am. Compl. ¶ 140.

Abacus Tech. Corp., 128 F.3d 191, 196-97 (4th Cir. 1997) ("Absent direct evidence of discrimination, [plaintiff] must satisfy the three-step proof scheme established in McDonnell Douglas to prevail on his ADA . . . claim[]."), overruled on other grounds by Baird v. Rose, 192 F.3d 462 (4th Cir. 1999).

To avoid summary judgment when proceeding under ordinary principles of proof, "the plaintiff must produce direct evidence of a stated purpose to discriminate and/or [indirect] evidence of sufficient probative force to reflect a genuine issue of material fact." Rhoads v. FDIC, 257 F.3d 373, 391 (4th Cir.2001) (internal citations and quotation marks omitted). The Fourth Circuit has held that the "motivating factor" causation standard of Title VII is applicable to ADA claims. Baird v. Rose, 192 F.3d 462, 470 (4th Cir. 1999). Therefore, a plaintiff who "demonstrates that his or her disability played a motivating role in the employment decision" is "entitled to relief." Id.

Chauncey asserts that several facts provide direct evidence of discrimination on the basis of disability. Pl.'s Opp'n 12-15. First, Chauncey argues that Walls' displeasure with her refusal to engage in the November 16, 2010 meeting – including standing in the doorway and not coming to sit down at the table – constitutes direct evidence of disability discrimination. Id. at 12-13. Plaintiff alleges that Walls was "fully aware of Ms. Chauncey's discomfort from sitting due to cervical stenosis. . . ." Id. at 13. However, there is no evidence that Walls knew that Chauncey's medical condition was the reason she did not sit down or enter the room. While Chauncey relies on her testimony that she informed Walls that she could not lift anything larger than a milk jug, this reliance is misplaced. Pl.'s Dep. 315:11-13. Chauncey's lifting restriction is hardly the same thing

as a sitting restriction. This evidence does not show that her disability was a motivating factor in her termination.

Plaintiff next asserts that Walls chastising her for rescheduling a November 9, 2010 meeting because of a doctor's appointment constitutes direct evidence of discrimination on the basis of disability. Pl.'s Opp'n 13-14. Contrary to Chauncey's assertions, Walls' admonishment does not evidence unlawful discrimination. Rather, Walls testified that he was upset because Chauncey rescheduled the meeting "without respect to other members of the recruiting team" and during a time Walls had blocked out for vacation. Walls Dep. 34:6-11. There is no evidence that suggests that Walls' frustration was motivated by the fact that the change was made because of a doctor's appointment.

Finally, Chauncey claims that Walls called attention to her disability and embarrassed her during a November 16, 2010 meeting by asking her about attending a team bowling activity. Chauncey asserts that this further evidences discrimination on the basis of her disability. Pl.'s Opp'n 14-15. This argument fails. Even if Chauncey were unable to bowl due to her medical condition, she admitted that she could nevertheless have participated in the planned activity. Pl.'s Dep. 316:13-17. Confirming that a disabled employee can participate in a planned work event may, indeed, be the very opposite of discrimination on the basis of disability.

In short, Chauncey has failed to produce "direct evidence of a stated purpose to discriminate." Rhoads, 257 F.3d at 391. Additionally, plaintiff has not identified – and the court cannot glean – any indirect evidence of sufficient probative force to raise a genuine dispute as to whether disability was a motivating factor in Chauncey's

15

termination. Id.; Baird, 192 F.3d at 470. Since Chauncey fails to establish discrimination under ordinary principles of proof, the focus shifts to the approach outlined in McDonnell Douglas, 411 U.S. 792.

The McDonnell Douglas framework establishes a three-step proof scheme under which the burden of evidentiary production is shifted back and forth between the plaintiff and defendant; however, the ultimate burden of persuasion never shifts from the plaintiff to prove intentional unlawful discrimination. See Williams v. Cerberonics, Inc., 871 F.2d 452, 456 n.2 (4th Cir. 1989). Under McDonnell Douglas, the plaintiff must first establish a "prima facie case of discrimination." Merritt v. Old Dominion Freight Line, Inc., 601 F.3d 289, 294 (4th Cir. 2010) (citing Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981)). Once the plaintiff establishes a prima facie case, the burden of production shifts to the employer to produce evidence of a legitimate, non-discriminatory reason for the adverse employment action. McDonnell Douglas, 411 U.S. at 802. Finally, if the defendant meets this burden, the plaintiff must then prove that the defendant's proffered reasons "were not its true reasons, but were a pretext for discrimination." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000).

At the first step of the McDonnell Douglas approach, a plaintiff establishes a prima facie case of wrongful discharge under the ADA if she demonstrates that (1) she was within the ADA's protected class; (2) she was discharged; (3) she was fulfilling her employer's legitimate expectations at the time of discharge; and (4) the circumstances of her discharge raise a reasonable inference of unlawful discrimination. Reynolds v. Am. Nat'l Red Cross, 701 F.3d 143, 150 (4th Cir. 2012); Haulbrook v. Michelin N. Am., 252 F.3d 696, 702 (4th Cir. 2001). "Evidence of all four of these elements is necessary to

16

survive summary judgment." Id.  As noted, defendants do not contest that Chauncey was within the ADA's protected class or that Chauncey was discharged.

Chauncey argues that she has demonstrated the third element of her prima facie case by showing that her job performance was satisfactory.  Pl.'s Opp'n 16-17; see Pl.'s Dep. 226:14-23 (Chauncey received a $10,000 bonus in October 2009 and a pay raise at the end of 2009.); Pl.'s Dep. 136:14-137:19 (Bob Fei provided a positive reference for Chauncey's application for an advanced degree.); Pl.'s Dep. Ex. 17 (In Chauncey's February 2010 annual performance review, despite not meeting expectations in interpersonal relationships, her performance was "satisfactory overall.").

However, to establish a prima facie case of wrongful termination under the ADA, Chauncey must demonstrate that she "was fulfilling h[er] employer's legitimate expectations at the time of discharge."  Reynolds, 701 F.3d at 150 (emphasis added). Chauncey provides no evidence of satisfactory performance in the final six months of her employment.  In fact, the record is replete with evidence of Walls' dissatisfaction with Chauncey's performance.  In considering whether a claimant was adequately performing their job, "[i]t is the perception of the decision maker which is relevant not the self-assessment of the plaintiff." Beall v. Abbott Labs., 130 F.3d 614, 619 (4th Cir. 1997) (internal citations omitted), overruled on other grounds by Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002).  Walls had concerns about Chauncey being "less than honest" about the situation involving her "daughter-in-law," who was not, in fact, her daughter-in-law.  Walls 30(b)(6) Dep. 72:7-12.  He also claimed that Chauncey was "rude[]" and "disrespectful[]" in leaving a meeting early where he was trying to discuss some negative feedback she had received.  Walls 30(b)(6) Dep. 74:16-18.  Walls

17

indicated that he felt there was friction in the human resources office, especially between Chauncey and himself.  Pl.'s Dep. 213:1-16, 217:1-9.  In a January 8, 2010 meeting, Walls told Chauncey it was clear that she had a problem working for him and offered to help her leave the company.  Pl.'s Dep. 230:18-20.  Chauncey herself understood that Walls was not happy with her performance.  Pl.'s Dep. 247:12-20.  In June 2010, Walls began "losing confidence" in Chauncey as a result of presentations that she had not done well.  Pl.'s Dep. Ex. 18.  In an August 2010 mid-year review, Walls noted that Chauncey continued to refuse to accept feedback and that there was a "lack of trust" between her and other employees.  Pl.'s Dep. Ex. 20.  Walls gave Chauncey an overall rating of "generally not meeting expectations," and informed her that if she did not immediately meet expectations, there would be "no other alternative but to terminate [her] employment."  Id.  In the weeks leading up to her termination, Chauncey rescheduled a meeting for a time Walls had blocked out for vacation without approval, Pl.'s Dep. 310:3-10, and did not participate in a human resources meeting. Walls Dep. 34.

The evidence shows that, beginning in January 2010, Walls had concerns with Chauncey's performance, and that those concerns escalated until the time of her termination.  Even considered in the light most favorable to Chauncey, this evidence does not create a genuine issue as to whether she was "fulfilling h[er] employer's legitimate expectations at the time of discharge."  Reynolds, 701 F.3d at 150 (emphasis added).  Therefore, plaintiff has failed to establish a prima facie case of wrongful discharge under the ADA.

### 2.      Failure to Make Reasonable Accommodations

Under the ADA, unlawful discrimination on the basis of disability can also include the failure to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee . . . ." 42 U.S. C. § 12112(b)(5)(A).  Chauncey asserts an ADA discrimination claim based on Life Cycle's failure to reasonably accommodate her disability.  Am. Compl. ¶ 141.  In her few fleeting references to this claim, Chauncey appears to allege that Life Cycle failed to reasonably accommodate her disability because the company did not let her reschedule a meeting that was scheduled for the same time as a doctor's appointment.  See Pl.'s Opp'n 11, 14 n.9; Pl.'s Objections 26, 28.

In order for a plaintiff to establish a prima facie case against her employer for failure to accommodate under the ADA, the plaintiff must show: "(1) that [she] was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of [her] disability; (3) that with reasonable accommodation [she] could perform the essential functions of the position; and (4) that the employer refused to make such accommodations."  Wilson v. Dollar Gen. Corp., 717 F.3d 337, 345 (4th Cir. 2013) (internal quotes omitted).  Even viewed in the light most favorable to Chauncey, there is insufficient evidence to raise a genuine dispute as to whether Life Cycle refused to make an accommodation.  Chauncey claims she was "entitled to a reasonable accommodation in the form of a few hours off from work to attend a critical doctor's appointment on the afternoon of November 10, 2010."[8]  Pl.'s Opp'n 14 n.9.  Neither the complaint nor the record show that Chauncey was unable to reschedule the meeting or that she missed her

---

[8] The court believes that Chauncey likely means November 9, 2010, as that was the date on which the meeting at issue was originally scheduled.  See Pl.'s Opp'n 14; Pl.'s Dep. Ex. 29.

doctor's appointment.  An employer expressing frustration over the approach used to reschedule a meeting is not the same as refusing to make an accommodation.  Since there is no evidence that defendants denied the accommodation she sought, Chauncey has failed to show a prima facie case of discrimination based on the denial of a reasonable accommodation.

Chauncey has failed to make a prima facie showing of discrimination under the ADA based on either wrongful discharge or failure to accommodate.  Therefore, the court adopts the R&R and grants Life Cycle's motion for summary judgment as to Chauncey's ADA discrimination claim.

### B.     FMLA Claims

Chauncey alleges the magistrate judge erred both in concluding that several actions by defendants did not interfere with her FMLA rights and in determining that the FMLA retaliation cause of action should not proceed because there was no evidence of pretext.  Pl.'s Objections 2-3.  Defendants allege the magistrate judge erred in concluding that there is sufficient evidence to create a genuine issue of fact as to whether Life Cycle requiring Chauncey to check in weekly and perform work tasks while on leave interfered with her FMLA rights.  Defs.' Objections 1.

The FMLA provides that covered employees are entitled to a total of twelve work weeks of leave during any twelve month period for family- and health-related matters, as well as a right to be restored to a position of employment equivalent to the one held by the employee when the leave commenced.  29 U.S.C. §§ 2612, 2614.  The FMLA entitles employees to leave for, among other reasons, a serious health condition that renders the employee unable to perform employment functions.  See 29 U.S.C. § 2612(a)(1)(D).

20

Chauncey brings two separate claims under the FMLA:  (1) a claim for interference with her rights, and (2) a claim for retaliation based on the exercise of those rights.

### 1.    Interference[9]

To make out a prima facie case of interference under the FMLA, an employee must establish that (1) she is an eligible employee; (2) her employer was covered by the FMLA; (3) she was entitled to leave under the FMLA; (4) she gave her employer adequate notice of her intention to take leave; and (5) the employer denied her FMLA rights to which she was entitled.  Car v. Mike Reichenbach Ford Lincoln, Inc., No. 4:11-cv-2240, 2013 WL 1282105, at *7 (D.S.C. Mar. 26, 2013).  Additionally, a plaintiff must show she has been prejudiced by the violation.  Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81, 89 (2002); Moticka v. Weck Closure Sys., 183 F. App'x 343, 347 (4th Cir. 2006) ("Before liability will be imposed on an employer for violating an employee's rights under the FMLA, the employee must show that she was prejudiced by the violation.").  It is undisputed that Chauncey satisfies the first four elements of her interference claim.  See Defs.' Objections 3.

The FMLA regulations issued by the Department of Labor state that the terms "interfering with" an employee's FMLA rights include not only refusing to authorize FMLA leave, but violating the FMLA or its regulations, discouraging an employee from using such leave, and avoiding responsibilities under the FMLA.  29 C.F.R. § 825.220(b). [P]rejudice can be proven by showing that the employee lost compensation or benefits "by reason of the violation," 29 U.S.C. § 2617(a)(1)(A)(i)(I); sustained other monetary losses "as a direct result of the violation," § 2617(a)(1)(A)(i)(II); or suffered some loss in

---

[9] Both plaintiff and defendants have moved for summary judgment on Chauncey's FMLA interference claim.

employment status remediable through "appropriate" equitable relief, such as employment, reinstatement, or promotion, § 2617(a)(1)(B).  Anderson v. Discovery Commc'ns, LLC, 517 F. App'x 190, 198 (4th Cir. 2013).

Chauncey argues that several actions taken by Life Cycle constitute interference with her FMLA rights:  (1) requiring her to check-in on a weekly basis while on leave; (2) requiring her to do work while on leave; (3) placing more stringent FMLA requirements on her than required by the company's FMLA handbook; (4) giving her a negative performance review two days after starting FMLA leave; (5) failing to give her a raise or salary increase while on leave; and (6) giving her diminished authority and duties upon returning from leave.

### a.    Weekly Update Requirement

Chauncey first argues that Life Cycle's requirement that she check in weekly regarding her status interfered with her FMLA rights.  A check-in requirement in and of itself does not violate the FMLA; in fact, the regulations expressly contemplate that employers may require employees to periodically report their status.  29 C.F.R. § 825.311(a) ("An employer may require an employee on FMLA leave to report periodically on the employee's status and intent to return to work.").  Therefore, Chauncey must show that sending weekly updates interfered with her FMLA rights by discouraging her from taking leave.  See 29 C.F.R. § 825.220(b).

Chauncey went on full-time FMLA leave on August 19, 2010.  Answer ¶ 30.  In an email from Walls to Chauncey on September 21, 2010, Walls told her that "it will be helpful if we can stay in communications on a weekly basis regarding your status."  Pl.'s Supp. Ex. 3; see also Pl.'s Dep. 291:16-20.  Between going on full-time leave and Walls'

email requesting weekly updates, a time period of just over a month, Chauncey sent Walls ten emails updating her status.  Defs.' Objections Ex. 1.  In an August 29, 2010 email, Chauncey indicated that she would likely be out until at least mid-September, but that she could send daily updates if Walls would like.  Id.  Even after indicating that she would be on leave for an extended period, and with no suggestion that Walls requested daily reports, Chauncey voluntarily sent the company five more updates.  Id.

Defendants assert that Walls, by instituting weekly updates, was trying to reduce the amount of emails Chauncey was sending.  Defs.' Objections 3.  According to Walls, "[Chauncey] had left me just numerous voice messages, e-mails, and it got to the point where it was just too much."  Walls Dep. 48:1-3.  So Walls asked Chauncey to keep him informed on a weekly basis in "an attempt to reduce the volume of communications . . . ."  Walls Dep. 48:3-6.  Regardless of Walls' intentions, no reasonable jury could find that Walls asking Chauncey to do something she was already doing with regularity would interfere with her FMLA leave.  Chauncey's reliance on Terwilliger v. Howard Mem'l Hosp., 770 F. Supp. 2d 980 (W.D. Ark 2001), for the proposition that requiring employees to initiate contact with the employer is an unreasonable interference with an employee's right to FMLA leave is misplaced.  See Pl.'s Mot. for Partial Summ. J. 10.  Crucial to the holding in Terwilliger were weekly calls by the employer pressuring the employee to return to work.  770 F. Supp. 2d at 981.  There is no evidence here that Walls or other Life Cycle employees repeatedly pressured Chauncey to return to work.  Requiring an employee on leave to provide reports is consistent with the FMLA regulations, and without more, does not give rise to a claim for interference.  To the

extent Chauncey's interference claim is based on defendants' request that she report her status to them weekly, defendants are entitled to summary judgment.

### b.    Contacting Chauncey and Requesting Work

Chauncey next argues that defendants interfered with her FMLA rights by contacting her and asking her to do work. While the mere fact that an employer communicates with an employee during FMLA leave is not per se evidence of interference, see Dodgens v. Kent Mtf. Co., 955 F. Supp. 560, 564 (D.S.C. 1997), "calling [the employee] can be probative of [interference] when the [employee] is asked to continue working." Sullivan v. Cato Corp., 2006 WL 644469 (D.S.C. 2006). Generally, requiring an employee to perform work during FMLA leave constitutes interference with that employee's FMLA rights. See, e.g., Arban v. W. Pub. Corp., 345 F.3d 390 (6th Cir. 2003); Franks v. Indian Rivers Mental Health, 2012 WL 4736444 (N.D. Ala. Sept. 30, 2012). However, "[f]ielding occasional calls about one's job while on leave is a professional courtesy that does not abrogate or interfere with the exercise of an employee's FMLA rights." Reilly v. Revlon, Inc., 620 F. Supp. 2d 524, 537 (S.D.N.Y. 2009) (holding that there was no interference where a temporary replacement called the plaintiff, who was out on FMLA leave, once or twice about where to find things on the computer).

On September 28, 2010, Walls sent an email to Chauncey asking her where he could find certain information so that others could work with that information while she was on leave. Pl.'s Dep. Ex. 21. In making this request, Walls specifically indicated that "there is no expectation for you to update or do work, just send what you have or point

folks to where the files are." <u>Id.</u>  Walls requested the information again during a phone conversation on October 12, 2010.  Pl.'s Mot. for Partial Summ. J. Ex. 4.

Chauncey told one of the employees who the information was intended for "that it wasn't as simple as sending files because [you] wouldn't understand where the data was because of the various places that they were put in the files" and "it would be absolutely no use of you. . . ."  Pl.'s Dep. 293:3-9.  Chauncey then told the employee to "tell [Walls] that . . . I'll just put it together and send it to you."  Pl.'s Dep. 293:14-15.  However, Chauncey did not communicate with Walls that further work was needed.  Pl.'s Dep. 293:16-25.  To the extent that Chauncey performed any work while on leave, that choice was completely voluntary.

No reasonable jury could find that defendants interfered with Chauncey's right to FMLA leave by asking her to send information to other employees.  Walls' limited request, which emphasized that no additional work was to be done, does not give rise to a claim for interference.  To the extent Chauncey's interference claim is based on Walls' request that she send information to other employees, defendants are entitled to summary judgment.

        c.        **Application of Life Cycle's FMLA Handbook to Chauncey**

Chauncey argues that the fact that defendants did not follow Life Cycle's FMLA check-in policy, and instead required her to check in more frequently, constitutes interference with her FMLA rights.  As discussed above, "[a]n employer may require an employee on FMLA leave to report periodically on the employee's status and intent to return to work."  29 C.F.R. § 825.311(a).  However, such a policy "may not be

25

discriminatory and must take into account all of the relevant facts and circumstances related to the individual employee's leave situation."  Id.

Life Cycle's company policy requires that an employee on leave "contact his/her supervisor or department head every 30 days" concerning her medical status and intention to return to work.  Pl.'s Mot. for Partial Summ. J. Ex. 8.  Therefore, Chauncey argues that Life Cycle disregarded its own FMLA policy, violating 29 C.F.R. § 825.311(a), by requiring her to advise Walls of her status on a weekly basis.  Pl.'s Mot. for Partial Summ. J. 13.  Violations of the FMLA or its regulations can be considered interference under 29 C.F.R. § 825.220(b).

Assuming that interference has been shown, Chauncey must still show prejudice. See Ragsdale, 535 U.S. at 89 ("To prevail under [the FMLA], an employee must prove, as a threshold matter, that the employer violated § 2615 by interfering with . . . her exercise of FMLA rights.  Even then, [the FMLA] provides no relief unless the employee has been prejudiced by the violation. . . .").  However, Chauncey has not offered evidence of any prejudice suffered because she was subjected to a more frequent call-in requirement than company policy required.  Chauncey has not shown "any wages, salary, employment benefits, or other compensation denied or lost . . .by reason of the violation." 29 U.S.C. § 2617(a)(1)(A)(i)(I) (emphasis added).  Likewise, Chauncey has not shown "any actual monetary losses sustained . . . as a direct result of the violation," Id. § 2617(a)(1)(A)(i)(II) (emphasis added), or equitable relief that may be appropriate, Id. § 2617(a)(1)(B).  While Chauncey claims that she is owed back pay as damages, Pl.'s Mot. for Partial Summ. J. 14, there is no indication that those damages were suffered by reason

26

of, or as a direct result of, Life Cycle not applying its company-wide FMLA policy to Chauncey.

Because Chauncey has failed to show prejudice, to the extent Chauncey's interference claim is based on Life Cycle requiring her to update her status more than often than called for in the company's FMLA policy, defendants are entitled to summary judgment.

### d.    No bonus or Salary Increase

Chauncey argues that not receiving a salary increase or a bonus, as she had in years past, constitutes interference with her FMLA rights.  An employee who takes leave is entitled, on return from such leave, "to be restored . . . to the position of employment held by the employee when the leave commenced" or "an equivalent position with equivalent benefits, pay, and other terms and conditions of employment."  29 U.S.C. 2614(a)(1).  An employee is "entitled to any unconditional pay increases which may have occurred during the FMLA period, such as cost of living increases."  29 C.F.R. § 825.215(c)(1).  However, pay increases conditioned upon seniority, length of service, or work performed must be granted in accordance with the employer's policy with respect to employees on an equivalent leave status for a reason that does not qualify as FMLA leave.  Id.  Equivalent pay also includes "any bonus . . . , whether it is discretionary or non-discretionary, made to employees consistent with the provisions [for salary increases]."  Id. § 825.215(c)(2).

There is relatively little evidence regarding either Life Cycle's bonus or its salary increase policies.  Defendants assert that Chauncey did not receive a salary increase because she was on notice that her performance was not acceptable and her annual salary

was already the highest among her peers.  Answer ¶ 34.  Therefore salary increases seem to be at least partially performance-driven.  Chauncey admits that her bonus arrangement is based on "performance and other factors," Pl.'s Dep. 28:14-19, but the evidence does not clarify what those other factors are.

Genuine issues remain about the exact nature of Life Cycle's salary increase and bonus policies, especially as they applied to Chauncey, as well as whether denying Chauncey either resulted in her being returned to a position of equivalent pay or interfered with her FMLA rights by discouraging her from taking leave.  Because of these genuine issues, to the extent that Chauncey bases her FMLA interference claim on not receiving a bonus or salary increase while on leave, summary judgment is inappropriate.

### e.     Negative Performance Review

Chauncey argues that receiving a negative performance review on August 13, 2010, four days after she requested FMLA leave and two days after she was placed on leave, interfered with her FMLA rights.  Chauncey has presented no evidence to show that receiving the negative review interfered with her right to take FMLA leave.  As discussed at length above, Walls had been dissatisfied with Chauncey's job performance for quite some time before issuing the performance review.  Moreover, there is no evidence that the performance review discouraged Chauncey from taking leave.  Because Chauncey has failed to show a genuine issue as to whether her negative performance review interfered with her FMLA rights, defendants are entitled to summary judgment to the extent Chauncey's interference claim is based on her negative performance review.

### f.    Diminished Authority and Duties

Chauncey argues that her diminished authority and duties, based on her inability to reschedule recruiting meetings, upon her return from leave interfered with her FMLA rights.  An employee who takes leave is entitled, on return from such leave, "to be restored . . . to the position of employment held by the employee when the leave commenced" or "an equivalent position with equivalent benefits, pay, and other terms and conditions of employment."  29 U.S.C. 2614(a)(1).  An equivalent position must have "substantially similar duties, conditions, and responsibilities as the employee's original position."  29 C.F.R. 825.215(e).

When Chauncey returned from work, she attempted to reschedule a recruiting meeting originally scheduled for November 9, 2010, because she a doctor's appointment scheduled at the same time.  Pl.'s Dep. 310:1-10.  Walls admitted that Chauncey had the authority to reschedule the meetings before taking leave, but that since she was "just returning" he "expected" that she would consult him before rescheduling the meeting.  Walls Dep. 27:15-29:15.  Walls told Chauncey after she got back that she should not have rescheduled the meeting.  Pl.'s Dep. 309:18-21.

Whether Chauncey was restored to the position of employment held when leave commenced or an equivalent position, and whether Chauncey having to consult Walls before rescheduling meetings constituted a "substantially similar duty," are subject to genuine dispute.  To the extent Chauncey relies on her diminished duties upon return from leave, a reasonable jury could find for either side, and therefore summary judgment is inappropriate.

As to Chauncey's FMLA interference claim, the court accepts the R&R in part and rejects the R&R in part. The court denies plaintiff's partial motion for summary judgment and grants defendants' motion for summary judgment except to the extent plaintiff's claim relies on her diminished duties upon return from leave and not receiving a salary increase or bonus while on leave.

### 2.     Retaliation

The FMLA makes it "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(2). FMLA retaliation claims are analyzed under the burden-shifting framework of McDonnell Douglas. Yashenko v. Harrah's NC Casino Co., LLC, 446 F.3d 541, 550-51 (4th Cir. 2006). A plaintiff must first make a prima facie showing that she (1) "engaged in protected activity"; (2) that the "employer took adverse action against [her]"; and (3) that "the adverse action was causally connected to the plaintiff's protected activity." Cline v. Wal-Mart Stores, Inc., 144 F.3d 294, 301 (4th Cir. 1998). An adverse employment action is one that "adversely affect[s] the terms, conditions, or benefits of the plaintiff's employment." Holland v. Washington Homes, Inc., 487 F.3d 208, 219 (4th Cir. 2007) (internal quotation marks omitted). If the plaintiff puts forth sufficient evidence to establish a prima facie case of retaliation and the employer then offers a "non-discriminatory explanation" for the plaintiff's termination, the plaintiff bears the burden of establishing that the employer's proffered explanation is "pretext for FMLA retaliation." Nichols v. Ashland Hosp. Corp., 251 F.3d 496, 502 (4th Cir. 2001).

It is undisputed that Chauncey engaged in a protected activity by taking FMLA leave.[10] It is also undisputed that Chauncey's failure to receive a salary increase in October 2010 and her ultimate termination qualify as adverse employment actions. Chauncey alleges that her August 2010 mid-year performance evaluation was also an adverse employment action. Pl.'s Opp'n 23. A negative written evaluation, by itself, generally does not constitute an adverse employment action. See Thompson v. Potomac Elec. Power Co., 312 F.3d 645, 652 (4th Cir. 2002) (citing Spears v. Mo. Dep't of Corr. & Human Res., 210 F.3d 850 (8th Cir. 2000)). However, a negative performance evaluation may be an adverse employment event when plaintiff can "point to a tangible employment action that she alleges she suffered, or is in jeopardy of suffering, because of the downgraded evaluation." White v. Baxter Healthcare Corp., 533 F.3d 381, 402 (6th Cir. 2008). Because Chauncey's mid-year performance review threatened termination if she did not immediately meet expectations, Pl.'s Dep. Ex. 20, the court will treat this evaluation as an adverse employment action.

To meet the third element of her prima facie case, the adverse actions must be causally connected to the protected activity. Chauncey offers evidence of the close temporal proximity of the protected activities and the adverse actions. She notes that the negative mid-year performance review was issued "[a] mere three days" after she had applied for FMLA leave. Pl.'s Opp'n 23. Additionally, Chauncey was terminated fourteen days after her attorney sent a letter to Life Cycle alleging that she had been subject to illegal employment action and soon after coming back from FMLA leave. Pl.'s Opp'n 23-24. While evidence as to the closeness in time of the protected activity and

---

[10] Chauncey's attorney writing to Life Cycle was potentially a protected activity under FMLA, although counsel did not specify what discriminatory acts he was alleging. See Pl.'s Opp'n Ex. A. The court will assume for the purposes of the present motion that the letter was a protected activity.

adverse employment action "far from conclusively establishes the requisite causal connection, it certainly satisfies the less onerous burden of making a prima facie case of causality." Yashenko, 446 F.3d at 551 (quoting Williams v. Cerberonics, Inc., 871 F.2d 452, 457 (4th Cir. 1989)). Therefore, Chauncey has made a prima facie showing of retaliation.

The burden then shifts to defendants to offer a non-discriminatory explanation for their actions. As discussed at length above, there is extensive evidence documenting Walls' dissatisfaction with Chauncey's job performance. The adverse employment actions taken were the culmination of job performance problems dating back over a year, to October 2009. Therefore, defendants have met their burden of production, and the burden shifts back to Chauncey to establish that the proffered reasons were pretext for FMLA retaliation. See Glunt v. GES Exposition Servs., Inc., 123 F. Supp. 2d 847, 872 (D. Md. 2000) ("[P]oor job performance qualifies as a legitimate nondiscriminatory reason to demote an employee.").

"[T]he plaintiff can prove pretext by showing that the [defendant's] explanation is unworthy of credence or by offering other forms of circumstantial evidence sufficiently probative of [retaliation]." Price v. Thompson, 380 F.3d 209, 212 (4th Cir.2004) (internal quotation marks omitted). While closeness in time "far from conclusively establishes the requisite causal connection," Yashenko, 446 F.3d at 551, "the trier of fact may still consider the evidence establishing the plaintiff's prima facie case and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual." Reeves, 530 U.S. at 143 (quoting Burdine, 450 US at 255 n.10 (1981)). In addition to close temporal proximity, Chauncey notes her previous satisfactory performance reviews

as well as evidence discrediting defendants' two primary reasons for her termination.[11] Because the facts are such that a "reasonable jury could return a verdict for [Chauncey]," Anderson, 477 U.S. at 248, Chauncey has produced sufficient evidence to give rise to a genuine issue as to whether defendants' non-discriminatory explanation is pretextual. Therefore the court rejects the R&R and denies defendants' motion to dismiss Chauncey's FMLA retaliation claim.

## IV.  CONCLUSION

Based on the foregoing, the court **REJECTS** the magistrate judge's R&R in part and **ACCEPTS** the magistrate judge's R&R in part.  The court **DENIES** plaintiff's motion for partial summary judgment.  The court **GRANTS** defendants' motion for summary judgment as to the following claims: (1) gender discrimination and retaliation under Title VII; (2) discrimination and retaliation on the basis of disability under the ADA; (3) retaliation in violation of the FLSA and ADEA; (4) breach of contract; (5) breach of the implied covenant of good faith and fair dealing; (6) violation of the EPA; and (7) promissory estoppel.  The court **GRANTS** defendants' motion for summary judgment on plaintiff's FMLA interference claim, except that the court **DENIES** summary judgment on this claim to the extent it relates to plaintiff's diminished duties upon return from leave and not receiving a salary increase or bonus while on leave. The court **DENIES** defendants' motion for summary judgment as to plaintiff's FMLA retaliation claim.  Plaintiff's motion to strike is **DENIED** as moot because the court has disposed of the substantive motions.

---

[11] Chauncey refers to the two grounds mentioned by Walls for her termination, rescheduling a meeting and failure to sit and participate at another meeting, Pl.'s Dep. 314:1-8, apparently inferring that those grounds alone were not sufficient for termination.  Pl.'s Objections 25.

**AND IT IS SO ORDERED**.

_____
**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**September 30, 2013**
**Charleston, South Carolina**